# RUETE v. ELWELL.

PATENTS; INTERFERENCE.

1. An applicant for a patent who adopts the claim of a patentee for the purpose of interference, is not entitled to demand a construction of the claim that would render it invalid by reason of that which he had himself accomplished, if it can be upheld by any other reasonable interpretation not necessarily inconsistent with the statement of the patentee.

2. The several claims of a patent ought, if possible, to be construed so that each may be sustained and so that the broader one will not be incumbered with the limitations of the narrower one; so that where one claim in a patent for armored insulating conduits for the carriage of electric wires, calls for an inclosed insulating tube capable of being bent or curved without fracture, it will not be limited to the soft, thin rubber tube of the patentee's exhibit, if in another claim a hard rubber tube of sufficient rigidity and stiffness to hold its form under all conditions is called for.

3. An applicant does not show anticipation of a claim in a patent granted for improvement in armored insulating conduits for the carriage of electric wires, by showing that, to avoid the effect of heat on the paper which he had been using in his tubes, he inserted a rubber at some points where the tubes would be subjected to heat, without showing that he conceived the necessity for a material that was capable of bending without fracture so as to destroy insulation or impede the free passage of the electric wires.

No. 122.  Patent Appeals.  Submitted March 16, 1899.  Decided May 4, 1899.

HEARING on an appeal from a decision of the Commissioner of Patents in an interference case.  *Affirmed.*

The facts are sufficiently stated in the opinion.

*Mr. F. W. Ritter, Jr.,* for the appellant.

*Mr. Fred. L. Emery* for the appellee.

Mr. Justice SHEPARD delivered the opinion of the Court:

This is an appeal from the decision of the Commissioner

of Patents awarding priority of invention to Russell T. Elwell for an improvement in armored insulating conduits for the carriage of electric wires. Elwell is a patentee, under date of July 14, 1896, upon an application filed January 28, 1896, and the first claim of his patent constitutes the issue of the interference, as follows:

"An armored insulating conduit consisting of a metallic armor tube, an inclosed insulating tube capable of being bent or curved without fracture, and an interposed layer of water-resisting cementitious substance uniting the two tubes one to the other."

The application of the appellant, William T. Ruete, was filed November 6, 1896. His first claim is identical with that of Elwell aforesaid, and was apparently framed to obtain a declaration of interference with his patent.

Elwell claims to have conceived the invention in December of 1893, and to have reduced it to practice in February, 1894. He undertakes to account for his delay in applying for a patent by efforts made in the meantime to cheapen the production in order to make it available commercially.

Ruete is connected with the Interior Conduit and Insulation Company of New York, which for some years prior to January, 1895, had manufactured and sold a metal conduit with an inner tube of paper. This tube was covered with some preparation of pitch or asphalt to render it waterproof and then inserted in the metal conduit. The company furnished a large amount of this conduit to the contractors for the erection of an immense office building in the city of New York. The latter made complaint that where the conduit ran near the steam-pipes of the building the paper tubes became "tacky" by reason of the excessive heat and caused the electric wires to stick. To overcome this difficulty, Ruete about January 17, 1895, conceived the idea of a rubber tube as a substitute for the paper. His suggestion was acted upon by the company, and rubber tubing was purchased and inserted in about six thousand feet of metal

pipe for use in the places where the exposure to the heat occurred.    The pipe was made in sections ten feet long and heated.    The rubber tube having been coated with a suitable waterproof cement was then inserted in the pipe, to which it adhered.    There were about six hundred feet of elbows treated in the same way.    These were delivered to the contractors in February and March, 1895, and by them worked into the building, where they gave satisfaction.    None of this pipe was preserved, and none other was made until after Elwell had commenced to put his improved conduit upon the market.

Ruete exhibited a short piece of his present complete conduit and a piece of rubber tubing which was said to be similar to that used in the building aforesaid.    This piece of tube appears to have been flexible at the time it was exhibited in evidence, but has since become hard and brittle— a condition that has been attributed to oxidation.    The foregoing is relied on as proof of reduction to practice.

Two pieces of Elwell's conduit made in February, 1894, and which are exhibits in the case, are the foundation of his earliest claim of reduction to practice.    The first of these pieces was made in this way: A tube of soft rubber compound was formed by hand upon a rod, by means of which it was inserted in a short piece of metal pipe of suitable size.    Before insertion it was coated with rubber cement, which caused it to adhere to the metal pipe, and the rod was then withdrawn.    The second was made by introducing in another short metal pipe a corresponding length of soft thin rubber tube of a kind commonly used for siphons.    Both pieces were straight.    No wire was introduced into them, and no attempt was made to test their capacity to bend without fracture or "buckling" in so doing.

The issue, it will be observed, calls for three distinct elements—an armor tube, an inclosed insulating tube capable of being bent or curved without fracture, and an interposed layer of water-resisting cementitious substance.    According

to the broad terms of this issue, which constitutes the first claim of each party, the armor tube need not be capable of bending at the time of its use as a conduit. It may be flexible, or it may be of cast metal curved to the desired extent in course of production and incapable of further flexion. The inclosed insulating tube may be of any composition capable of being bent or curved without fracture, and this capacity may be shown in its adaptation to a previously bent or curved armor tube, or in connection with a straight but flexible one that may be afterward curved or bent as desired in a particular use.

It is contended on behalf of Ruete, however, that the issue in respect of the " inclosed insulating tube capable of being bent or curved without fracture " is not susceptible of a broad interpretation in the light of Elwell's specifications. After referring to the details of these specifications and avoiding a criticism of his former argument found in the decision of the examiners-in-chief, counsel for Ruete states his contention in the following words:

" We do not contend that the insulating tube must be ' of the composition of hard rubber . . . partially vulcanized,' but we do contend that it must have the characteristics of stiffness, rigidity and flexibility so as to hold its shape in lengths of ten or twenty feet or more, may be inserted in the metallic armor tube without buckling or doubling, will hold its full rounded shape when bent or curved, and will not collapse and prevent the insertion of the electric wires when curved or bent sufficiently for use. It must be the mechanical equivalent of a partially vulcanized hard rubber compound, as well as having its insulating and moisture resisting properties."

It is further argued that, whilst these essential characteristics are found in the insulating tube of Elwell's commercial conduit, made since the date of Ruete's claim of conception and reduction to practice, they are not found in the soft thin rubber tubes of the first two Elwell exhibits,

and therefore the latter fail to show even a conception of the actual invention, much less its reduction to practice.

The fact that Ruete's specifications harmonize with his interpretation of the issue adds no weight to his contention. The Elwell patent was issued nearly four months before he filed his application. With that before him he prepared it and adopted Elwell's first claim for the apparent purpose of an interference. Having done this, he is not entitled to demand a construction of the claim of the patentee that would render it invalid by reason of that which he himself had accomplished, if it can be upheld by any other reasonable interpretation not necessarily inconsistent with the statement of the patentee. *Latham* v. *Force and Parenteau*, 82 O. G. 1690; *Tracy* v. *Leslie*, 14 App. D. C. 126: 87 O. G. 891.

The law requires the applicant for a patent to make specific claim or claims defining his invention for the information of the public, and when so made and granted it cannot be enlarged in his interest beyond the plain import of its terms. When necessary to its understanding the specifications and drawings, if any, may be resorted to. The claim may also be limited by the specifications when such is the necessary effect of their recitals, and its true meaning ascertained from the context. *Tilghman* v. *Proctor*, 102 U. S. 707, 721, 728; *Howe Machine Co.* v. *National Needle Co.*, 134 U. S. 388, 394; *White* v. *Dunbar*, 119 U. S. 47, 51; *McClain* v. *Ortmayer*, 141 U. S. 419, 425; *Celluloid Mfg. Co.* v. *Arlington Mfg. Co.*, C. D., 1893, 483, 488 : 64 O. G., 1263.

These principles were expressly recognized in the decision of the examiners-in-chief that has been affirmed by the Commissioner. In that decision attention was called to the fact that Elwell's patent contained five claims. The first is that of the issue herein. The second is limited to the combination of the metallic armor tube and an inclosed insulating tube cemented thereto, "both capable of being bent or curved without fracture." The third omits men-

tion of the cement and specifies an "inclosed insulating tube of the composition of hard rubber, but only partially vulcanized to leave it in a condition capable of bending without fracture, yet of sufficient stiffness and rigidity to hold its full rounded form under all conditions." The fourth and fifth claims contain substantially similar descriptions of the character of the insulating tube. Adopting the rule laid down in certain cases cited (*American Dunlap Wire Co.* v. *Erie Rubber Co.,* C. D. 1896, 197 : 74 O. G. 963; and *Cohansey Glass Mfg. Co.* v. *Wharton,* C. D. 1886, 296; 36 O. G. 343), that the several claims of a patent ought, if possible, to be construed so that each may be sustained and so that the broader one will not be incumbered with the limitations of the narrower ones, the examiners-in-chief devoted considerable space to a critical analysis of the statements of the Elwell specifications, and concluded by overruling the contention of Ruete for the limitation of the broad claim.

No important purpose would be served by restating the decision on this point, with or without addition thereto; and, referring to it, we think it sufficient to say that we see no reasonable ground for disturbing the conclusion reached.

On the conclusion that Elwell has shown a conception of the invention of the issue as early at least as February, 1894, three questions follow : (1) Did the construction of the two short pieces of conduit by Elwell in February, 1894, amount to reduction of the invention to practice ? (2) If not, was he exercising due diligence in the matter of perfecting his invention at the time of Ruete's construction? (3) Did Ruete's construction and use of his conduit in January, 1895, show conception of the invention and its reduction to practice?

The first of these questions is a difficult one, and the tribunals of the Patent Office have not been unanimous in their answers.

It must be admitted that some inventions "are so simple and their purpose and efficacy so obvious that the complete construction of one of a size and form intended for and capable of practical use might well be regarded as a sufficient reduction to practice without actual use or test in an effort to demonstrate their complete success or probable commercial value." *Mason* v. *Hepburn,* 13 App. D. C. 89: 84 O. G. 149.

A reasonable doubt on this point will be resolved against the inventor, and special circumstances—as, for example, unreasonable delay in making practical or commercial use of the invention, or in applying for a patent, and the like— would have a tendency to raise this doubt in a particular case. *Mason* v. *Hepburn, supra.*

When we consider the nature of this invention, and the purpose and uses it seeks to accomplish, together with the long and not very well explained delay of Elwell both in applying for a patent and in manufacture, we are hardly prepared to say that he ought to have the benefit of reduction to practice, from the construction of his two small pieces of conduit in the manner described. They resemble, in some respects closely, constructions that have been held to amount to nothing more than models or incomplete and abandoned experiments. *Traver* v. *Brown,* 14 App. D. C. 34: 86 O. G. 1324; *Beals* v. *Finkenbiner,* 12 App. D. C. 23; *Burr* v. *Ford,* 5 App. D. C. 26, 28; *Guilbert* v. *Killinger,* 13 App. D. C. 107: 84 O. G. 313.

As, however, the determination of any one of the three questions in the appellee's favor will require the decision to be affirmed, we prefer to pass the first two and rest our judgment upon the answer to the third.

Some of the objections made to Elwell's claim of conception and reduction to practice apply with force to the proof of invention and reduction to practice by Ruete. Superadded is the burden imposed upon him by Elwell's regularly issued patent to establish his claim by clear and convincing

proof. Elwell's original construction has been preserved and is open to inspection. That of Ruete is hidden in the walls and finish of the building in which it was installed.

It is clear that Ruete used a rubber insulating tube as a substitute for his prepared paper tube in order to obviate the defect of the latter when exposed to heat. It is also apparent that he had no idea at the time, and did not have until he saw Elwell's patent, of the additional uses and advantages of a rubber insulating tube capable of being bent or curved without fracture either independent of or in combination with the metal armor tube. His failure, however, to perceive this additional use and advantage would not bar his right to claim it as a part of his invention if it was a necessary incident; for it is well settled that one who is the first to make an invention is entitled to claim all the uses and advantages that belong to it—that is to say, that follow directly from it as described or manufactured—whether they were perceived by him or not. *Roberts* v. *Ryer*, 91 U. S. 150, 157; *Stow* v. *Chicago*, 104 U. S. 547, 550; *Potts* v. *Creager*, 155 U. S. 597, 606; *Hill* v. *Hodge*, 12 App. D. C. 528, 530.

If, then, the proof shows that Ruete actually made an armored conduit with an insulating inner tube of rubber capable of being bent or curved without fracture, he ought to be awarded priority. Considering the burden of proof imposed upon him, as heretofore stated, we are not satisfied that he has discharged it. It must be borne in mind that he was seeking, not a flexible tube, but one which would withstand the heat that at points of contact with the steampipes destroyed the usefulness of his common paper tube. This rigid paper tube had been carried around corners by means of elbows, in which it was inserted through a heating process, and then joined to the longer and straight sections of the conduit. There was no suggestion whatever of a need for a flexible tube that would bend with the armor tube, or be capable of introduction into the latter as bent or

curved beforehand, without fracture, so as to destroy insulation or impede the free passage of the electric wires. Still, as we have seen, if this advantage was not within the conception or perception of Ruete, its benefit would, nevertheless, accrue to him if his invention as carried out was directly and clearly susceptible of the additional use. On the other hand, what was in the mind of the inventor is very important in determining the weight of the evidence in respect of the material of which the insulating tube was constructed.

To overcome the objection to the "tacking" of the paper tube, rubber tube was procured from the ordinary stock kept by a manufacturer of rubber. Bills for this tubing of corresponding date were produced in evidence, but do not disclose its particular quality. When the testimony was taken two years later, a piece of rubber tube was produced. Ruete and two others connected with his company testified that this was substantially like that used in the conduits made in January, 1895. Another said it was like "to all appearances," but whether made of a different composition he could not say. When exhibited, this tube was flexible and apparently capable of the use claimed for it; but it has since hardened and become brittle. It seems rather improbable that a manufacturer would keep in stock tubing which by exposure to the air would speedily undergo this radical change of quality, though he doubtless would keep some that was soft, some harder and more rigid, as well as some that was hard and brittle. The harder tube would have answered all the purposes of the inventor at the time as a substitute for the prepared paper. Being rigid, it could more easily be thrust into the armor tube without danger of "buckling" or "doubling." Under these circumstances it would naturally be preferred. There is no evidence that the elbows were prepared in any manner different from those intended for the reception of the regular paper tube. There is no evidence that the conduit was bent or intended to be

bent or curved in the course of installation, nor is there any tending to show the slightest difference, in respect of the manner of joining, fitting and installing, between the rubber lined straight sections and elbows and those containing the paper tube of which the bulk of the complete installation consisted. The contractor's foreman, who had immediate charge of the installation, was called as a witness by Ruete, but gave no evidence on this point or regarding the quality of the rubber tube. Still bearing in mind the fact that the flexibility of the insulating tube was of no importance at the time of this construction, the evidence of interested persons, without the aid of anything to refresh their memories, testifying to the identity of a piece of rubber tube produced by the party in interest with one used two years before in a construction that has since remained hidden from view, lacks the convincing weight necessary to overcome a former regularly issued patent.

As has been said by Mr. Justice Brown: "Oral testimony, unsupported by patents or exhibits, tending to show prior use of a device regularly patented is, in the nature of the case, open to grave suspicion. Granting the witnesses to be of the highest character, and never so conscientious in their desire to tell only the truth, the possibility of their being mistaken as to the exact device used, which, though bearing a general resemblance to the one patented, may differ from it in the very particular which makes it patentable, are such as to render oral testimony peculiarly untrustworthy; particularly so if the testimony be taken after the lapse of years from the time the alleged anticipating device was used." *Deering* v. *Winona Harvesting Co.*, 155 U. S. 286, 300.

This reasoning furnishes one of the main supports of the rule that requires such anticipations to be proved by evidence so cogent as to leave no reasonable doubt. Id.; *Wurts* v. *Harrington*, 10 App. D. C. 149, 153.

Again, the doubt arising from the circumstances referred

to, if not itself sufficiently reasonable, is made so by the failure of the appellant to call witnesses from the factory where the rubber tube was made. It was still in operation in the same city, and from it was procured, at the time of taking the testimony, the piece of tube exhibited; and yet no attempt was made to obtain evidence from any one connected with it. Some officer or agent of the manufacturer ought to have been able to describe with reasonable certainty the character of the tubes manufactured and kept in stock before and during January, 1895; and it is not unreasonable to suppose that the sales books, from which the receipted bills produced in evidence were made, would have enabled them to describe with accuracy the actual composition and quality of the tubes sold and delivered to the Insulation Company on those dates. If there be any explanation of the omission to produce evidence from that source, the record is silent in respect of it, and inferences therefrom unfavorable to the appellant are unavoidable. *Burr* v. *Ford,* 5 App. D. C. 26, 29.

It follows that the decision awarding priority to Elwell must be affirmed. It is so ordered, and this decision will be certified to the Commissioner of Patents, as required by law. *Affirmed.*