**BENDIX AVIATION CORPORATION,**
Appellant,

v.

**SMITHS AMERICA CORPORATION, S.** Smith & Sons (England) Ltd., Henry Hughes & Sons, Ltd., Kelvin and Hughes, Ltd., Appellees.

No. 13339.

United States Court of Appeals District of Columbia Circuit.

Argued March 13, 1957.

Decided Sept. 19, 1957.

Mr. Dean Acheson, Washington, D. C., with whom Messrs. Edwin McElwain, John W. Douglas, William B. Kerkam and Ralph H. Hudson, Washington, D. C., were on the brief, for appellant.

Mr. William D. Hall, Washington, D. C., with whom Messrs. Nelson Moore and Elliott I. Pollock, Washington, D. C., were on the brief, for appellees.

Before EDGERTON, Chief Judge, and PRETTYMAN and WASHINGTON, Circuit Judges.

WASHINGTON, Circuit Judge.

This is a suit for patent royalties, based on a 1936 cross-licensing contract under seal. The parties to the contract are S. Smith & Sons (England), Ltd., a British manufacturing concern, plus its subsidiary corporations (all referred to as Smiths), and Bendix Aviation Corporation (Bendix). Appellees Smiths and their American subsidiary, Smiths America Corporation, the assignee of Smiths' income rights under the contract, brought suit in the District Court against appellant Bendix, alleging royalties due by reason of Bendix's manufacture and sale of sextants equipped with an averaging device that was alleged to be covered by three of Smiths' patents. The instruments at issue here are Mark IX-A sextants, which Bendix manufactured and sold to the United States Government during World War II. Briefly, the instrument consists of a sighting device by which the angle of elevation of a celestial body may be determined, and an attached averaging device, which automatically averages the results of 60 separate sightings taken during a two-minute period of observation.

After trial before the court, judgment was entered in favor of Smiths. Bendix appeals, presenting two major problems for our consideration: (1) Whether Bendix has an absolute defense to liability on the royalty contract by reason of certain action which the British Government allegedly took in 1940 and 1941, prior to the manufacture and sale of the sextants by Bendix to the United States Government, and (2) if not, whether Bendix in manufacturing the sextants used any of Smiths' patents and thereby incurred liability for royalty payments when the sextants were sold.

Bendix asserts absolute non-liability on the royalty contract on the ground that the British Government "as an act of sovereign power granted, for use of the United States Government during World War II only, a release and right to manufacture the specific device here involved", and that in doing so the British Government abrogated Bendix's obligation on its contract with Smiths. To establish this defense Bendix offered a series of communications between officials of the British and United States Governments. Written during 1940 and 1941, these letters sought to reach agreement on plans to facilitate the exchange of technical information between the two governments to promote their joint defense efforts.[1] Bendix also offered a series of similar letters dealing specifically with the Mark IX-A sextant. Among this latter group was a "letter of release" mailed on November 10, 1941, from Air Marshal Roderic Hill of the British Air

1. Among the ultimate results of this negotiation was the Patent Interchange Agreement of August 24, 1942, 56 Stat. 1594. The P.I.A., which became effective as of January 1, 1942, is not claimed to apply to this suit.

Commission to the Office of Director of Naval Intelligence in the United States Navy Department. This letter is the core of Bendix's claimed defense of absolute non-liability. Pertinent excerpts from the Hill letter are as follows:

"Forwarded herewith is one set of drawings for the Automatic Averaging attachment for the Mark IX A Sextant.

\* \* \* \* \* \*

"The above-mentioned drawings, data, and manufacturing information have been released by the U. K. Government to the U. S. Government and permission to manufacture has been given, solely in order to assist the joint defense plans of our respective Governments and upon the understanding that the use of such information, etc., will be strictly limited to that purpose and to the period of the present war emergency.

"Furthermore, the information has been released and permission to manufacture given in reliance upon the general arrangements agreed between our respective Governments, both in regard to secrecy and as to the protection of commercial rights in respect of all information and equipment exchanged.

"All commercial rights relating to the Mark IX Sextant or to any improvement subsequently released (or otherwise based upon the use of information furnished by or upon the instructions of the U. K. Government) are hereby expressly reserved."

■ The District Court excluded this letter for the reason that the drawings sent with the letter and referred to in it were not produced. The correctness of this ruling is our threshhold question. Whether writings or drawings referred to in a document must be produced before the document is admitted depends on whether the materials

referred to are necessary to an understanding of the proffered document, and on such matters the trial court's discretion normally controls. VII Wigmore, Evidence § 2104 (3d ed. 1940). Bendix urges here, however, that the drawings referred to were not necessary to an understanding of the scope of the alleged release. It argues that the prior writings between the same parties, exchanged during 1941, indicate that a release of "the averaging device" was requested and that the sending of such a release was acknowledged.[2] Hence, Bendix says, it is apparent that the release referred to "the averaging device." The difficulty is that without the drawings it was not clear to the trial court, nor is it to us, which component parts comprise "the averaging device." One of the three patents in issue is for a shutter apparatus (Everitt Patent No. 2,252,341). This shutter, Smiths alleged, was a part of the sextant but not a part of the averaging device (the device being an attachment to the sextant). The best and perhaps the only way to determine whether the shutter was covered by the purported release would be to examine the drawings. Furthermore, the uncertainty as to the scope of the release is increased by the following circumstance, as the trial court found: "There were two sets of drawings respectively showing different parts of the automatic averaging attachment for the Mark IXA sextant. Only one of these two sets was forwarded with the Hill letter of November 10, 1941, and there is no evidence as to what this particular set of drawings disclosed." We therefore conclude that the District Court did not err in excluding the Hill letter.

■ Even if there is room for doubt on this point, we should not disturb the trial court's ruling except to avert a result "inconsistent with substantial justice." Cf. Fed.R.Civ.P. rule 61, 28 U.S.C.A. Examination of the entire record in this case convinces us that such is

**2.** Other related correspondence was also excluded when the Hill letter was ex- cluded, but it appears in the record before us.

not the situation here.[3] Bendix argues that the effect of the Hill letter is to abrogate Bendix's contractual liability to Smiths under the pre-existing licensing contract. Smiths replies that the letter simply allowed the United States Government to make use of an invention which the British Government had shown to this Government in secret. In short, says Smiths, it was a release from secrecy, the principal purpose of such letters being to protect the rights of British inventors who had not filed U. S. patent applications.

■ To agree with the construction urged by Bendix would require a more convincing record than is here relied upon, for we will not lightly conclude that a document, ambiguous on its face, evidences the intention of the British Government to abrogate a contractual obligation between private parties.[4] Whether the letter's use of the word "released" referred to a release of contractual liability, or a release from the requirements of secrecy, or a release of some other sort, is by no means clear. Certainly there is no specific statement that contractual liability is being abrogated. On the contrary, the letter states that "commercial rights" are "expressly reserved." Bendix urges that "commercial rights" refers only to rights to non-governmental production, whereas Smiths contends that the reservation preserved patent rights and surely contract rights under licensing agreements. Like the scope of the word "released," the meaning of the word "commercial" in this context is highly uncertain. Bendix points out that the prior correspondence between the British and American Governments dealing generally with exchange of information specifically mentioned that "the patentee or owner of

the commercial or design rights should be compensated," but that such a statement was omitted from the Hill letter. The conclusion urged is that this protection was abandoned. But it is just as likely, if not more so, that this protection was subsumed under the general reservation of "commercial rights." Indeed, Bendix's construction of the word "commercial" as meaning "non-governmental" renders the reservation surplusage, since the release itself was limited "to assist the joint defense plans of [the] respective Governments." For these reasons we find no occasion to disturb the trial court's conclusion that the defense of absolute non-liability fails.

■ We turn now to the question whether Bendix used any of the patents in controversy, namely, Gray Patent No. 2,140,579, Everitt Patent No. 2,252,341 and Everitt Re-issue Patent No. 22,184. The trial court found that Bendix used all three. Since the royalty contract provides for the payment of royalties whenever one party manufactures and sells instruments embracing "a patented device of the other Party," appellees were entitled to recovery if Bendix used one or more of their patents.

Examination of the record convinces us that Claim 12 of Everitt Patent No. 2,252,341 covers the Bendix device, and that Bendix is liable for its use. We need not discuss the other patents involved, or pass on the District Court's conclusions regarding them.

Claim 12 of Everitt No. 2,252,341, as finally allowed, reads as follows:

"12. In an observation device the combination of a frame, means supported on said frame for making an observation measurement, a register supported on said frame controlled by said means for indicating the

---

3. Bendix urges in its brief that since all the facts and documents are in the record, this court can consider the issue presented by the release.

4. This is not to suggest that we would necessarily question the validity, under British law, of the action which Bendix

alleges the British Government took. Cf. Banco de Espana v. Federal Reserve Bank, 2 Cir., 1940, 114 F.2d 438, 443–444. But the apparent absence of any provision for compensation seems to us a strong indication that abrogation was not intended and did not occur.

numerical average measurement of a series of a predetermined number of said measurements, signalling means supported on said frame *operated by and* in response to completion of said series of measurements *to indicate that said series is completed, and means for rendering said signalling means inoperative to permit another series of measurements to be made.*" (Emphasis added.)

Bendix makes no contention that its sextant does not utilize the combination of parts specified in Claim 12 of the Everitt patent, nor would the record support such a claim. The "signalling means" in both the Everitt and Bendix instruments is a shutter. Bendix strongly urges that Claim 12 does not read on the Bendix sextant for the reason that the method of operating the Bendix shutter is not the method specified in the Everitt patent. This contention is Bendix's sole basis for distinguishing the Everitt device. The argument is as follows: The Bendix shutter is operated by *independent clockwork*. The clockwork is part of the computing mechanism. When 60 sightings have been made, the clockwork mechanism automatically terminates the computing process and (via the connecting gear of a geneva wheel) causes the shutter to obscure the observer's vision. On the other hand, the Everitt shutter is operated *by the manual action of the observer* in pushing the clutch-lever (a part of the sighting mechanism) after each sighting, until the series of sightings is complete. But Claim 12 of the Everitt patent does not require the operation of the shutter to be related to any one part of the sextant, as Bendix urges, but, instead, requires it to be related to a particular *event*. The claim requires the shutter to be operated "by and in response to completion of said series of measurements." And while in the two sextants a different part causes the shutter to

operate, in both the occasion for the shutter to operate is the same, i. e., the completion of the series of measurements, and the operation is "by and in response to" completion. Bendix's alleged distinction is thus not supportable.

■ Bendix further urges that under the doctrine of "file wrapper estoppel" Everitt abandoned—and Smiths is now precluded from making—any claim "to shutters, like the R.A.E.-Bendix device, which are not operated by the sextant's adjustment means." But we find no such abandonment. Everitt's original Claim 9 spoke of a means for making an observation measurement, and of "a member for rendering said means inoperative to make further observation measurements after said series of measurements has been made." The Examiner rejected the claim for indefiniteness, on the ground that no structural relationship between the shutter and the rest of the sextant was shown. Changes in language were made, and a new Claim 12 added, but the Examiner still was not satisfied. As to Claims 9–11, the Examiner said that they were indefinite and unwarranted because they included "a member * * * for rendering said means [for making an observation measurement] inoperative," and "because no definite structural or functional relation is developed between the said 'means * * * for rendering' and the other included elements. The means should be defined as automatically controlled or released by the means for making observations." As to the new Claim 12, however, the Examiner's only statement was that the words "operated by and" (as indicated by italics in our quotation, above) should be inserted in place of the word "operative," which had been used *in the original claim.* This change was made, and the Examiner then allowed Claim 12 as it now stands. Amendments were also made to Claims 9–11, and as amended they were allowed.[5] Bendix

---

5. In connection with the amendments to Claims 9, 10 and 11, Everitt represented

to the Examiner that "Claims 9, 10 and 11 are amended in order to overcome the

says that this history shows that the shutter was to be operated by the adjustment means, and that any shutter not so operated was not claimed. But, as we have said, we do not read Claim 12 as specifying that the shutter is to be operated by the adjustment means, or by any other single part of the sextant. Much less do we read the Claim and the wrapper as abandoning any claim to a shutter operated, as is the Bendix shutter, "by and in response to completion" of the series of measurements, under the very language of the Claim.[6] The doctrine of "file wrapper estoppel," as expressed in such cases as Schriber-Schroth Co. v. Cleveland Trust Co., 1940, 311 U.S. 211, 312 U.S. 654, 61 S.Ct. 235, 85 L.Ed. 132, is thus inapplicable to the facts before us.[7]

For these reasons, the judgment of the District Court must be

Affirmed.

rejection thereof as being indefinite. Each of these claims as amended now indicates that the 'means for preventing further measurements from being taken' or 'the member movable into the field of vision' is automatically controlled by the means for making the observations. Claim 9 has been amended to specify that the device includes a member movably supported on the frame and controlled by means for making measurements to move automatically *into a position to prevent further observation measurements from being made* after the series of measurements has been made, and means for resetting said member *to another position to permit another series of measurements to be made.*

"It is urged that claim 9 as amended is no longer indefinite or too broad inasmuch as it is the function of the shutter disclosed in the instant application to prevent further observations from being made after the series of observations is completed by moving into a position to obscure the bubble and thus preventing the reference point from being seen. Until the shutter has been reset to its initial positions, it is impossible to take another accurate measurement." (Emphasis in original.)

Whatever limits these representations may impose on Claims 9, 10 and 11, they

can hardly limit the plain language of Claim 12 as allowed. See Great Lakes Equipment Co. v. Fluid Systems, Inc., 6 Cir., 1954, 217 F.2d 613, 616; cf. Ruete v. Elwell, 1899, 15 App.D.C. 21, 26.

6. In Bendix's main brief it recognizes that Claims 9–11 require a relationship between the shutter and the observation means, whereas Claim 12 requires a relationship only between the shutter and completion of the series of measurements. But it calls this a "difference without a distinction," apparently suggesting that "completion of said series" was intended to refer to completion accomplished only by operation of an observation means. In its reply brief, however, Bendix has assumed that Claim 12 itself requires the shutter to be operated by the observation means. It says Claim 12, before amendment, "required only that the [shutter] be operative 'in response to' said *means * * *.*" (Emphasis supplied.) There is nothing in the file history of Claim 12 to support the first suggestion, and the second is flatly contradicted by the terms of the Claim itself.

7. See also Freeman v. Altvater, 8 Cir., 1933, 66 F.2d 506, 508.