## THOMSON v. CITIZENS' NAT. BANK OF FARGO.

## CITIZENS' NAT. BANK OF FARGO v. THOMSON.

(Circuit Court of Appeals, Eighth Circuit. November 14, 1892.)

Nos. 156, 167.

**1. PATENTS FOR INVENTIONS—PATENTABILITY—NOVELTY.**

Letters patent No. 385,648, July 3, 1888, and reissued letters patent No. 10,977, December 25, 1888, issued to Walter Thomson for an improvement in the manufacture of bank account books, whereby the short leaves are creased or perforated for folding in such a manner as to transfer the column of balances on the right-hand page to the succeeding left-hand page, are valid, as even skilled bookkeepers had not previously discovered it, although the device is so simple and obvious, as well as useful, that it would seem that it should have been always known and used. Hollister v. Manufacturing Co., 5 Sup. Ct. Rep. 717, 113 U. S. 59, 72, distinguished.

**2. SAME—SCOPE OF PATENT LAWS.**

A new and useful improvement in the manufacture of bank account books is embraced within the terms of the patent laws.

**3. SAME—LICENSE—NONTRANSFERABLE.**

A copartnership conducting a bank was permitted to use an improvement in bank account books for seven months before application for a patent was filed, which was done December 31, 1886. The firm was dissolved January 1, 1887, and succeeded by a corporation which used the old account book, and perhaps other similar books, with the patentee's consent, during 1887. In 1888, 1889, and 1890 it paid a royalty for all such books used, though purchased in part from unlicensed makers. Thereafter it used the books, but paid no royalty. *Held*, that the implied license to the copartnership under Rev. St. § 4899, was incapable of assignment or transfer, and that the corporation infringed.

Appeals from the Circuit Court of the United States for the District of North Dakota.

In Equity. Bill by Walter Thomson against the Citizens' National Bank of Fargo, N. D., for infringement of letters patent. The circuit court held the patent valid, but dismissed the bill. Complainant appeals, his cause being numbered 156. Defendant also appeals, his cause being numbered 167. Reversed, and decree directed for complainant.

Statement by SANBORN, Circuit Judge:

These are cross appeals from a decree dismissing a bill in equity brought by the patentee in original letters patent No. 385,648, dated July 3, 1888, and reissued letters patent No. 10,977, dated December 25, 1888, for an improvement in the manufacture of bank account books, against the Citizens' National Bank of Fargo for infringement. The patented improvement consisted in constructing each of the short leaves of bank account books, by so ruling and perforating or creasing them, that the margins thereof could be conveniently folded back upon themselves, and made thus to disclose a column for the entry of balances of account on the pages preceding those to which these columns belonged, so that when the leaves were unfolded the columns thus disclosed would appear on the pages succeeding those upon which they appeared when the leaves were folded.

The state of the art prior to this invention was such that bank account books had long been manufactured with long and short leaves. On the margin of each long leaf, on the left-hand page of the open account book, were usually written the names of those having accounts with the bank. The remainder of this page and the right-hand page were generally divided by perpendicular lines into six spaces, to accommodate the business of the six days of a week, and each of these spaces was again divided by like lines into three columns, for

the entry, opposite their names, of the checks, deposits, and balances of the customers, respectively. One or more of the leaves succeeding each long leaf was so far shortened that when turned to the left its margin would fall upon the line on the long leaf that separated the space where the names were written from the columns for the accounts. This shortening of these leaves obviated the necessity of rewriting the names upon the short leaves as they were turned, but, when the right-hand page had been filled, it was necessary to rewrite upon the next page the last column, which contained the balances of the accounts, as a basis for their continuance, and to accomplish this the bookkeeper must continually turn the leaf as he proceeded, or must copy off the entire column upon a separate piece of paper, and then recopy it upon the succeeding page. To obviate the necessity of thus rewriting this column of balances, and to transfer it without copying from the margin of the right-hand page of the book to the margin of the succeeding left-hand page, was the object of complainant's invention. This he accomplished by so ruling and then creasing or perforating each of the short leaves in a line parallel to its margin, and at such a distance therefrom, that by folding it upon itself it disclosed upon the right-hand page of the open book and in the proper location of the last column of balances thereon, the first column on the succeeding left-hand page, which was ruled for the column of balances. When any leaf was thus folded back, and this column filled, the simple turning and unfolding of the leaf transferred this column of balances to the succeeding page. After describing in his specifications the usual construction of bank account books, his improvement in their manufacture, and its advantage, with proper references to figures attached illustrating it, the patentee claimed:

"(1) The bank account book, A, having a suitable number of full leaves, C, and alternate series of short leaves, B, each of said short leaves having margin, b, creased or perforated at b' substantially as and for the purposes set forth.

"(2) The bank account book herein described, composed of alternate long and series of short leaves, the several long leaves prepared to receive the depositors' names on the left-hand side, and both also prepared to receive the accounts for several successive days, the right-hand end of each of said short leaves having a margin adapted by folding to receive the last day's balance, so that when the leaf is turned, and said margin straightened out, said balance forms the beginning of the next day's account on the next page."

The application for the original letters patent was filed December 31, 1886. The defendant was organized as a national bank January 1, 1887. It succeeded to the business, books, and bookkeeper of the Bank of Fargo, which was a copartnership. Complainant ordered the first book containing his improvement in April, and received it in May, 1886, and the bookkeeper of the Bank of Fargo, who got his first idea of this improvement from complainant, commenced June 2, 1886, to transfer his balances on the account book he was using, without rewriting, by folding the short leaves of his account book to the right, and continued to use this book in that way, with the knowledge of, and without objection from, complainant, during that year and the next, until the book was filled. The complainant arranged with certain manufacturers to make and sell bank account books containing his invention in 1887, and the defendant bought its account books for 1888 and 1889 of these manufacturers. Defendant ordered from unlicensed manufacturers in 1889, and used in 1890, account books containing this invention, and paid the complainant a royalty thereon. Defendant ordered from unlicensed manufacturers in 1890, and used in 1891, account books containing this invention, and for this infringement this suit was brought.

The circuit court held the patent valid, and this holding the defendant assigned as error. That court held that, "within two years prior to the application for the patent by Walter Thomson, the Bank of Fargo, the predecessor of the defendant, made and used a bank account book with the knowledge and consent of Thomson, the said patentee, embodying substantially the same devices embraced in and protected by said reissued letters patent No. 10,997, and the defendant, as successor of the said Bank of Fargo, has a right to make and use, and to continue to make and use, the thing invented, the right to which is secured in said patent, without liability therefor," and on that ground dismissed the bill, and this holding is assigned as error by the complainant.

C. E. Joslin, for Walter Thomson.
Seth Newman, for Citizens' Nat. Bank.

Before CALDWELL and SANBORN, Circuit Judges, and SHI-
RAS, District Judge.

SANBORN, Circuit Judge, (after stating the facts.) Letters pat-
ent grant a public franchise, giving to the inventor some compensa-
tion for the exercise of his inventive genius in the discovery of, and
his labor and ingenuity in reducing to practice and describing, novel
and useful inventions, by which the public may attain beneficial re-
sults with less expenditure of time and labor. From every patented
invention of value the compensation derived by the inventor is small
in proportion to the benefit conferred upon the public. The invent-
or's reward is limited to a few years, at most, while the benefit to the
public continues forever. No patented invention can, in the nature
of things, be valuable to its owner unless it is of greater value to the
public even during the term of his franchise, since the latter will
not purchase the right to vend or use it unless it is more profitable
to do so than to do without it. Letters patent issued under our
constitution and laws thus offer the necessary pecuniary inducement
to those gifted with inventive genius, without which they would not
be able to bestow the thought, time, and toil required to find, perfect
by experiment, reduce to practice, and give to the public many of
those useful inventions which have enabled us to excel in the manu-
facture and use of machinery, and in progress in all the useful arts,
that promote the efficiency and comfort of our citizens. The time,
thought, labor, and expense that produce a valuable invention are
the inventor's, the completed invention which is their product is
his, and when, in consideration of his describing it, and making it
useful to the public forever, he is granted the exclusive right to use
and vend it for a limited time, this franchise should not be regarded
as a monopoly conferred on him at the expense and to the prejudice
of the public, but as a just and fair consideration, granted for val-
uable services rendered, which both equitably and legally entitle him
to the same protection for this property that the owner of any other
species of property enjoys.

The defendant, after recognizing and paying for the use of com-
plainant's invention for three years, infringed it in 1891, and seeks
to justify its course on the ground that the patent is void for want
of novelty, and that its predecessor in 1886 used the invention with-
out objection from the complainant.

The letters patent were prima facie evidence of the novelty of the
invention, and no evidence was produced that it had ever been known,
described, or practiced before complainant discovered it. A glance at
the patent and the invention itself, and the fact that defendant used
and paid a royalty for the use of it for three years, and now infringes,
sufficiently establish its utility.

The mere fact that the patented invention is but a combination
of old ingredients or materials is not a tenable objection to the pat-
ent, since it is a general rule that a patentable invention may con-

sist entirely in a new combination or arrangement of old or well-known ingredients or elements, provided a new and useful result is thereby attained. Seymour v. Osborne, 11 Wall. 516, 542, 548; Rees v. Gould, 15 Wall. 187, 189.

That after the discovery and practice of the invention it seems so simple and obvious that the wonder is that it had not been always known and used is not always conclusive evidence that it has not sufficient novelty to be patentable, especially where the desirability of the useful result attained must have been long obvious to all persons skilled in the art or manufacture to which it pertains, but no one discovered or practiced it before the patentee. In The Barbed Wire Patent, 143 U. S. 275, 281, 283, 12 Sup. Ct. Rep. 443, the Glidden patent for the coiled barb in combination with the twisted wire, by which the barb is clamped and held firmly in position, was sustained, although strands of wire twisted together had long been used for fencing, and the older patent of Kelly described a wire fence composed of twisted wires and a two-prong diamond-shaped barb, with a central perforation, by which it was strung upon one of the wires, and afterwards fastened in place by the blow of a hammer. From this invention of Kelly to the coiled barb and twisted wire of Glidden, clamping the barb rigidly in place, is a slight advance, and it now seems obvious that the twisted strands would hold the barb coiled upon one of them rigidly in place; but no one seems to have perceived this fact, and put the twisted wires and coiled barb to this beneficial use, until Glidden conceived the idea, and thus utilized it, and the supreme court sustained his patent with the remark:

"It may be strange that, considering the important results obtained by Kelley in his patent, it did not occur to him to substitute a coiled wire in place of the diamond-shaped prong, but it evidently did not; and to the man to whom it did ought not to be denied the quality of inventor."

In Magowan v. Packing Co., 141 U. S. 332, 341, 343, 12 Sup. Ct. Rep. 71, the Gateley patent for "improvements in vulcanized India rubber packing" consisted simply in combining and uniting by vulcanization packing described in the prior patent of McBurney, which consisted of alternate layers of canvas and India rubber, and an elastic packing of pure gum, so that the gland of the stuffing box would force the packing with such tightness against the piston rod that a tight joint would result. The difficulty experienced with the McBurney packing had been that, as it was worn away by the piston rod, it did not have sufficient elasticity to keep the joint at the piston rod tight at all times. It may seem now that any mechanic skilled in the art, who observed the difficulty, must, by the exercise of his skill and reasoning powers, have arrived at the now obvious remedy; but no one seems to have done so before Gateley. His discovery was therefore held to be novel and patentable.

Defendant's counsel relies chiefly upon the decision in Hollister v. Manufacturing Co., 113 U. S. 59, 72, 5 Sup. Ct. Rep. 717, to sustain his contention that the complainant's improvement does not constitute an invention, but is "the suggestion of that common experience, which arose spontaneously, and by a necessity of human

reasoning, in the minds of those who had become acquainted with the circumstances with which they had to deal." But the reasoning of Mr. Justice Mathews in that case is inapplicable to the invention now before us. It rests upon the fact that as soon as the evil which the patented improvement he was speaking of remedied, became known, and the result attained by it became desirable, the improvement was immediately suggested. Thus, further on in the opinion, he said:

"As soon as the mischief became apparent, and the remedy was seriously studied by those competent to deal with the subject, the present regulation, which embodied the improvement, was promptly suggested and adopted; just as a skilled mechanic, witnessing the performance of a machine, inadequate, by reason of some defect, to accomplish the object for which it has been designed, by the application of his common knowledge and experience perceives the reason of the failure, and supplies what is obviously wanted. It is but the display of the expected skill of the calling, and involves only the exercise of the ordinary faculties of reasoning upon the materials supplied by a special knowledge, and the facility of manipulation which results from its habitual and intelligent practice."

But the evil which the complainant's invention remedied had been apparent for years. The useful result his invention attained must have been sought by generations of skilled bookkeepers, and their common knowledge and experience had never suggested this improvement. It had been apparent to all men manipulating the account books of banks ever since such books existed that it was desirable to make the last balance column of figures on the margin of the right-hand page of the open book the first column on the succeeding page, and thus to obviate the necessity of copying and recopying it whenever two pages were filled, and it became necessary to turn the leaf; but skilled bookkeepers, supplied with the special knowledge of their calling, "and the facility of manipulation which results from its habitual and intelligent practice," had gone on, from generation to generation, copying off this last column, turning the leaf, and then recopying it on the succeeding page, and no one of them, during all the time since such account books have been in use, by any display of the expected skill of his calling, or by the exercise of his faculties of reasoning, had ever arrived at the conclusion that complainant's improvement would accomplish its beneficial result until he discovered and made known his invention. The probative force of this fact, added to the presumption arising from the letters patent, satisfies us of the novelty and patentability of this invention. If the display of the expected skill of the calling or the exercise of the ordinary faculties of reasoning had been sufficient to discover and put in practice this improvement, some bookkeeper would have displayed that skill or exercised those faculties, and thus obtained this result long ago. These were not sufficient. It required something more to attain this result; it required the exercise of "that intuitive faculty of the mind, put forth in the search for new results or new methods, which creates what had not before existed, or brings to light what lies hidden." This faculty the complainant exercised, and the result is this invention,—an invention, it is true, that now seems so simple that we marvel that it did not before occur to every

bookkeeper, but one that clearly did not, and that is of such obvious utility that complainant is equitably, as well as legally, entitled to the full protection of his franchise. Loom Co. v. Higgins, 105 U. S. 580, 591; Consolidated Safety Valve Co. v. Crosby Steam Gauge & Valve Co., 113 U. S. 157, 179, 5 Sup. Ct. Rep. 513; Magowan v. Packing Co., supra; The Barbed Wire Patent, supra.

The technical claim of the defendant that this invention is not patentable because it is not embraced within the terms of the patent laws is without merit. The statute provides that "any person who has invented and discovered any new and useful art, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor," when his invention or discovery is made under the circumstances proved in this case. Section 4886, Rev. St. It is not perceived why one who invents a new and useful improvement in the manufacture of bank account books is not equally entitled to a patent with one who invents an improvement in the manufacture of barbed wire for fencing, of packing for the stuffing boxes of pistons, of safety valves for engines, of looms for weaving cloth, or of any other article upon improvements in the manufacture of which the supreme court has sustained patents.

A single question remains: Do the facts that the copartnership styled the Bank of Fargo was permitted to use the patented invention for seven months before the application for a patent was filed, and that the defendant subsequently succeeded to their business and property, confer upon it an implied license to make and use new account books, embodying the patented invention? The application for this patent was filed December 31, 1886. The Bank of Fargo first applied the invention to their account book June 2, 1886, and used it thereafter with complainant's consent until the firm was dissolved, January 1, 1887. The defendant corporation was organized and commenced business on that day. It succeeded to the business, account books, and assignable assets of the Bank of Fargo, and this old account book and perhaps others embodying the invention were used by the defendant with complainant's consent until January 1, 1888. In 1888, 1889, and 1890 it used the invention in its account books, and paid complainant royalty therefor. The defendant claimed, and the court below held, that under this state of facts the defendant held an implied license to make and use account books embodying this invention without liability to complainant under section 4899 of the Revised Statutes, which provides that "every person who purchases of the inventor or discoverer, or with his knowledge and consent constructs, any newly invented or discovered machine, or other patentable articles, prior to the application by the inventor or discoverer for a patent, or who sells or uses one so constructed, shall have the right to use, and vend to others to be used, the specific thing so made or purchased without liability therefor." This claim was unfounded, and the court below erred in sustaining it. The defendant did not purchase, construct, or use any article embodying the complainant's invention before he filed his application for a patent, since it did not come into existence until after that filing. Whatever license it had it derived from the dissolved copartnership

by purchase or assignment; but the only right the partnership had was the statutory privilege of using, and vending to others to be used, the specific patentable thing they had made with complainant's consent. This was not a grant of any portion of the franchise; it vested no title or interest in any part of the patent in the copartnership; it did not grant an exclusive right in the whole or in any specific part of the territory of the United States; it did not give an exclusive right or privilege in anything; it was a mere naked license, personal to the copartnership, and incapable of assignment or transfer. The members of the copartnership could convey, and the succeeding corporation could take, nothing under it by purchase, assignment, or succession, unless it might be the right to use the old account book until it was filled, and that was accomplished early in the year 1887 without objection from any one. Thus, in Hapgood v. Hewitt, 119 U. S. 226-234, 7 Sup. Ct. Rep. 193, where an employe of a Missouri corporation engaged in the manufacture of sulky plows invented certain improvements thereon, which the corporation, with his consent and assistance, embodied in the plows it manufactured and sold before he filed any application for a patent thereon, and that corporation was subsequently succeeded by an Illinois corporation, composed of the same stockholders, to which all the business and property of the former corporation were assigned and transferred, it was held that whatever license the former corporation derived from these facts was confined to it, and could not be transferred to its successor. Again, in Locke v. Bodley Co., 35 Fed. 289-294, an employe of a copartnership invented, perfected, and assisted his employers in manufacturing and reducing to practice an improvement in stop valves before he filed his application for the patent, which he subsequently obtained thereon. One of the partners died, and a corporation, in which the surviving partners owned all the stock, except 30 shares reserved for its employes, succeeded to the business and property of the firm, and to it the surviving partners assigned all the firm assets; but in a suit against the corporation for infringement these facts were held to confer upon it no right to use the patented improvement. To the same effect are Nail Factory v. Corning, 14 How. 193-216; Oliver v. Chemical Works, 109 U. S. 75-82, 3 Sup. Ct. Rep. 61. The result is that the implied license conferred upon any person who purchases of the inventor or discoverer, or with his knowledge or consent constructs, any newly invented or discovered machines or patentable articles prior to his application for a patent therefor, and within two years thereof, to use, or to vend to others to be used, the specific thing so made or purchased without liability therefor by section 4899 of the Revised Statutes, is a mere personal license, and is incapable of assignment or transfer. The defendant, therefore, was not protected by the implied license to the copartnership that preceded it in business, and the decree below is reversed, with costs, with instructions to enter a decree in favor of the complainant for a perpetual injunction, damages, and costs.