LITTLE MULE CORPORATION, Aluminum Products, Inc., and William E. Housel, Appellants,

v.

THE LUG ALL COMPANY, Appellee.

No. 16447.

United States Court of Appeals
Fifth Circuit.

April 7, 1958.

Rehearing Denied May 19, 1958.

Hal H. McCaghren, West Palm Beach, Fla., Charles J. Merriam and Merriam, Lorch & Smith, Chicago, Ill., George H. Lorch, Samuel B. Smith, Chicago, Ill., of counsel, for appellants.

Stanley B. Richard, Miami Beach, Fla., Harry Langsam and Stanley Bilker, Philadelphia, Pa., Howard Richard, Upper Darby, Pa., of counsel, for appellee.

Before RIVES, TUTTLE and CAMERON, Circuit Judges.

RIVES, Circuit Judge.

Involved in this suit are two lightweight, highly efficient, hand-operated winches which have been designed to enable an operator to lower loads under positive control. The Lug All Company manufactures its device under the Wallace Patent No. 2,633,328, dated March 31, 1953. It instituted the suit for infringement in the district court. The accused device is manufactured by appellants under authority of the Du Bois Patent No. 2,738,954, dated March 20, 1956.

The basic questions involved are: (1) whether the Wallace Patent is valid and, if so, (2) whether the appellants' device infringes it.

Before we come to these basic questions, however, we are faced at the outset with a procedural question. Appellee, The Lug All Company, has moved in this Court that appellant, Little Mule Corporation, be dismissed because of its supposed failure to conform to a stay order of the district court. It appears from the record and the appendix to appellee's motion to dismiss that the following sequence of events took place:

July 23, 1956. The trial court handed down its judgment, finding that defendants had infringed the Wallace Patent, decreeing that such infringement cease, and ordering that there should be an accounting prior to final judgment. Four

days later on July 27, 1956, well within the 10 day limit,[1] Little Mule Corporation, Aluminum Products, Inc., and William E. Housel[2] filed their motion for a new trial. Prior to July 31, 1956, September 6, 1956 was set as the date for a hearing on defendants' motion for a new trial and defendants moved that the decree and other proceedings under the judgment be stayed until hearing.

July 31, 1956. The district court ordered that the decree and proceedings under the judgment be stayed until the motion for new trial could be disposed of on condition that defendants file a bond in the sum of $12,000.[3]

August 3, 1956. William E. Housel, as General Manager and Vice President of Aluminum Products, Inc., delivered to the clerk of the district court a cashier's check in the amount of $12,000 payable to the clerk. The "bond" which was filed with this check did not mention Little Mule Corporation, except in the heading of the "bond" in which the defendants were set out as "Little Mule Corporation, a Florida corporation, Aluminum Products, Inc., a Florida corporation, and William E. Housel, Defendants." The condition of the "bond" was stated to be:

> " * * * if the *defendants* shall pay to the plaintiff any and all sums which the court may hereinafter decree, then this obligation shall be null and void and the clerk shall return to the *defendants* the sum of twelve thousand dollars ($12,000.-00); otherwise it shall remain in

full force and effect." (Emphasis supplied.)

The district court denied the defendants' motion for a new trial on October 18, 1956 and thereafter on November 16, 1956, only twenty-nine days later,[4] defendants filed their notice of appeal.

■ It appears that the appeal was properly filed and, as to the order of the district court that a bond for $12,000 be posted, it appears that appellee is in a better position with $12,000 in cash being turned over to the clerk of the district court than it would have been even if both Little Mule and Aluminum Products jointly had secured merely a bond for that amount. Under a bond, if any party had defaulted, all that appellee could have recovered in any event would have been $12,000. The fact is, however, the actual money has already been paid into the court on behalf of the defendants, and it appears that appellee has been properly secured as to its interlocutory judgment.

Appellee has failed to cite any authority supporting its motion and we are unable to see wherein appellee has been, or could be, harmed. Therefore, the motion to dismiss Little Mule Corporation's appeal is denied.

We now turn to the substantive questions and find ourselves involved in the art of lifting and lowering weights or exerting pulls by small hand-operated winches or jacks. It is a narrow field, and the district court has found that all claims of Wallace[5] are valid and have

---

1. Rule 59(b), Federal Rules of Civil Procedure, 28 U.S.C.A.

2. William E. Housel was dismissed from the action by the district court in its order denying the motion for a new trial.

3. In accordance with Rule 62(b), Federal Rules of Civil Procedure.

4. See Rule 73(a), Federal Rules of Civil Procedure.

5. The claims of the Wallace Patent are:
"1. A winch comprising a supporting frame, a cable drum, a ratchet wheel rotatable with the drum, an operating lever pivoted on the axis of the drum, a pawl on the lever pivoted thereon at a

point outside the path of travel of the ratchet teeth, a spring for biasing said pawl in a chosen direction, means for changing the direction of said bias, a pawl on the frame, and a spring normally biasing said frame pawl toward the ratchet, said frame pawl spring, the teeth on the ratchet and the free end of the lever pawl being arranged in alignment with said free end positioned to be interposed between the frame pawl spring and the teeth of the ratchet and being of sufficient length to contact the frame pawl spring when the lever is rotated in the direction which moves its pawl toward engagement with the ratchet teeth whereby the frame pawl spring will

been infringed. It may be noted first off that the two devices manufactured by the parties under their respective patents are for all practical purposes identical. Both consist of a frame in which is positioned a drum which can be revolved so as to wind up a cable, thus exerting a pull or lift. One flange of the drum is a ratchet wheel, which is rotated by means of a handle, the end of which is pivoted on the axis of the drum. On the handle is a pawl which may be biased either toward the ratchet wheel in the lifting position, or away from the ratchet wheel in the lowering position. Inside the frame and below the drum is the holding pawl. The holding pawl is equipped with a resilient means which biases it toward the ratchet wheel to hold the drum while the handle is moved to allow the handle pawl to engage another tooth. It is admitted that neither device is new in the art as far as its function to *lift* is concerned. The point of novelty claimed for

both the Wallace Patent and the accused device is the method of *lowering* loads under full control, one ratchet tooth at a time.

In the Wallace Patent, the resilient device attached to the holding pawl is designed to accomplish three purposes: (First) One end of this spring is attached to the free end of the holding pawl and the other end is attached to the frame in such a position as to bias the pawl against the ratchet teeth of the drum, thereby preventing the cable from unwinding while the handle returns for a different tooth. (Second) When the handle pawl is in the lowering position (biased away from the ratchet wheel) and when the handle is revolved in the winding direction, the free end of the handle pawl will come in contact with the spring near where it is anchored to the frame. The strength of the holding pawl spring is such as to overcome the strength of the lever pawl spring.

be acted upon by the lever pawl to bias the frame pawl away from the teeth of the ratchet, said lever pawl at the same time being moved by the frame pawl spring into its ratchet engaging position even against the opposing bias exerted by the lever pawl spring.

"2. A winch comprising a supporting frame, a cable drum, a ratchet wheel rotatable with the drum, an operating lever pivoted on the axis of the drum, a pawl on the lever pivoted thereon at a point outside the path of travel of the ratchet teeth, spring means associated with said pawl and adapted to bias the pawl in a chosen direction. means for changing the direction of said bias, a pawl on the frame, and other spring means associated with said frame pawl and adapted to bias the same toward the ratchet, ratchet engaging end of said lever pawl being of sufficient length and so arranged with respect to the ratchet engaging end of the frame pawl and the teeth on the ratchet as to project therebetween and one of said spring means being positioned so as to be interposed between the ratchet engaging end of the lever pawl and the ratchet engaging end of the frame pawl when the lever is rotated in the direction which moves its pawl toward engagement with the ratchet teeth, said spring means when so interposed being adapted to move the frame pawl away from the teeth and, at the same time, to move the

lever pawl into its ratchet engaging position even against the opposing bias exerted by the level pawl spring.

"3. A winch comprising a supporting frame, a cable drum, a ratchet wheel rotatable with the drum, an operating lever pivoted on the axis of the drum, a pawl on the lever, pivoted thereon at a point outside the path of travel of the ratchet teeth, a spring for biasing said pawl in a chosen direction, means for changing the direction of said bias, a pawl on the frame, and resiliently yielding means permanently associated with and connected to said frame pawl and constructed and arranged to bias the frame pawl toward the ratchet, the ratchet engaging end of said lever pawl being of sufficient length and so arranged with respect to the ratchet engaging end of the frame pawl and the teeth on the ratchet as to project therebetween, said resiliently yielding means being positioned so as to be interposed between the ratchet engaging end of the lever pawl and the ratchet engaging end of the frame pawl when the lever is rotated in the direction which moves its pawl toward engagement with the ratchet teeth, and said resiliently yielding means when so interposed being adapted to move the frame pawl away from the teeth and, at the same time, to move the lever pawl into its ratchet engaging position even against the opposing bias exerted by the lever pawl spring."

Therefore, the lever pawl is guided into position against the tooth next to the one which is being held by the holding pawl. (Third) As the lever pawl proceeds to its position against the tooth of the ratchet wheel, the holding pawl spring is compressed so as to exert bias against the free end of the holding pawl, tending to push it away from the ratchet tooth. The ends of the pawls and holding faces of the ratchet teeth on the drum are designed, however, to exert a pressure on the pawls toward the center of the ratchet wheel when either one is engaged against a tooth and is holding a load. Therefore, the holding pawl, although biased away from the ratchet teeth, will not spring away until the handle is rotated a few degrees further, releasing all the weight from the holding pawl and transferring it to the lever pawl. Now, as the handle is revolved in the unwinding direction, releasing the pressure of the lever pawl on the holding pawl spring, the holding pawl is biased back against the ratchet wheel; but, since the ratchet wheel has been revolving, the holding pawl now strikes the back of the tooth it previously held and stands in the path of the next tooth. When the next tooth comes in contact with the end of the holding pawl, it will again take the load and stop the unwinding motion. of the drum. When this happens and the handle is revolved a few degrees further, the pressure against the lever pawl is released and, in accordance with its bias, it springs away from the ratchet wheel and is positioned to repeat the operation.

The accused device also has a resilient means which performs three functions, but, instead of being one spring, it is composed of a cam and three springs. (First) The appellants have taken the Wallace Patent spring which has three functions and have broken it up into three different parts. The cam takes the place of the straight part of the Wallace Patent spring which makes contact with the lever pawl. (Second) They have two springs acting in tandem which exert a pull toward. the ratchet wheel, which is the normal function of the Wallace spring in its extended position. These tandem springs exert a bias on the holding pawl through the cam, one part of which is hooked around a stud on the moving end of the holding pawl. (Third) They have another spring which biases the holding pawl away from the ratchet wheel when compressed by the end of the lever pawl. Appellants' device functions as follows: Moving the handle in the winding position, the lever pawl is pushed against the ratchet wheel and the cam and its hook are forced away from the holding pawl stud. At the same time the compression spring, which is positioned between the stud and the cam, compresses so that when the weight is taken off of the holding pawl it springs away from the ratchet wheel. Then, as the handle is moved in the unwinding direction moving the lever pawl away from the cam, the two tandem springs pull the cam which pulls the holding pawl by means of the hook back against the ratchet where it catches the next tooth. When it has again taken the weight of the load, the handle pawl springs away from the ratchet wheel and the accused device is ready to repeat the operation. Thus, as found by the trial court, the accused device functions in the same way in order to accomplish the same result as the Wallace Patent.

Both in the trial below and at the oral hearing, reference was made to the presumption brought into being by the granting of a patent.[6] The fact that the accused device is manufactured under a later patent is, however, no defense to a charge of infringement. Blanchard v. Putnam, 8 Wall. 420, 75 U.S. 420, 19 L. Ed. 433; Zachos v. Sherwin-Williams Co., 5 Cir., 1947, 164 F.2d 234. Actually, the granting of the later patent and the conformity of the accused device thereto is of no importance in this case as far as the infringement issue is concerned. There are expressions in some cases implying that by a later patent the Government has granted a right to make and use the article so patented, but it

6. 35 U.S.C.A. § 282. "A patent shall be presumed valid."

must be remembered that a patent is not the granting of a right to make, use or sell. It grants only the right to exclude others from making, using or selling the patented device.[7] Many patents are granted in a field covered by prior basic patents and are merely tributary to such earlier patents and, in fact, cannot be practiced unless by license thereunder.[8] Even assuming that the Du Bois Patent is an improvement over the Wallace Patent and the other patents contained in that file and considered therewith, a privilege to manufacture a winch containing such a device is not granted.

Now, turning to the more difficult question of the validity of the Wallace Patent, we are immediately faced with the fact that all of its elements and functions are old and in prior art. The trial court found that its claims were valid. Mr. Baldwin, defendants' expert on patents, testified by deposition that no one patent in prior art disclosed the Wallace Patent:

"Q. Mr. Baldwin, can you show one patent in the prior art which you have studied which discloses the plaintiff's invention?

"Mr. McCaghren: There, again, we interpose an objection. We don't wish to be bound by this witness on prior art. We have other witnesses on prior art.

"The Court: Objection overruled.

"A. No.

"The Court: Let me get the import of that answer.

"Mr. Richard (reading): Q. Mr. Baldwin, can you show one patent in the prior art which you have studied which discloses the plaintiff's invention.

"The Court: The answer is 'No.'?

"The Clerk: The answer is 'No.'

"The Court: In other words, he didn't find any prior art in anything he has studied?

"The Clerk: No."

We do not agree with the interpretation of the district court there confirmed by the Clerk, because the witness was testifying as to what was disclosed by any one patent. A close examination of the Crooker Patent No. 552,044, dated December 24, 1895, the Dardani Patent No. 1,445,430, dated February 13, 1923, and the Anglemyer Patent No. 2,501,253, dated March 21, 1950, convinces us that all of the elements of the Wallace Patent came from the prior art.

In Dardani, the one spring [9] not only performs all three functions of the Wallace holding pawl spring but also the two functions of the lever pawl spring. The spring is attached between the holding pawl and the lever pawl and the lever is pivoted on the same shaft on which the holding pawl is pivoted. As the handle is moved in the winding direction, the spring first pushes the lever pawl against the ratchet wheel, and on further movement is compressed and exerts a bias against the holding pawl away from the ratchet wheel. As soon as the lever pawl takes all the weight of the load, the holding pawl springs away from the ratchet wheel. Then, as the handle is moved in the unwinding direction and the chain is unwound, the holding pawl is pulled against the back of the next tooth and, as the movement is continued, the spring is distended and a bias is exerted against the holding pawl, holding it in the path of the next tooth, and against the lever pawl, tending to pull it away from the ratchet wheel. When the handle is rotat-

7. "Every patent shall contain a * * * grant to the patentee, his heirs or assigns, for the term of seventeen years, of the right to exclude others from making, using, or selling the invention throughout the United States, referring to the specification for the particulars thereof." Title 35 U.S.C.A. § 154.

8. Cochrane v. Deener, 1876, 94 U.S. 780, 787, 24 L.Ed. 139; Cantrell v. Wallick, 1886, 117 U.S. 689, 694, 6 S.Ct. 970, 29 L.Ed. 1017; Temco Electric Motor Co. v. Apco Co., 1928, 275 U.S. 319, 328, 48 S. Ct. 170, 72 L.Ed. 298.

9. Spring Number 61 in Fig. 5, Dardani Patent No. 1,445,430, dated February 13, 1923.

ed far enough to transfer the weight from the lever pawl to the holding pawl, the lever pawl springs away from the ratchet wheel and the device is ready to repeat the operation.

The main difference between Crooker and Wallace is that Crooker uses a first-class lever instead of a second-class lever [10] and the holding pawl is equipped with two springs, one being a normal spiral spring wound around its shaft which biases the pawl toward the ratchet wheel, and the other a slight variation of the spring later found in Dardani. The latter is hooked between the frame and the free end of the holding pawl during the unwinding operation and unhooked from the pawl during the winding operation. This hooking and unhooking is done by hand. Since the Dardani spring in Crooker is connected only in the lowering operation, it performs only two functions: (1) It guides the lever pawl into the teeth of the ratchet wheel, and (2) upon further movement of the handle pawl, it becomes compressed and exerts a bias on the holding pawl away from the ratchet wheel. Further movement of the handle, as in Wallace and Du Bois, so as to transfer the weight of the load from the holding pawl to the lever pawl, allows the holding pawl to spring out of its holding position. Then, as the handle is reversed and moved in the unwinding direction, the handle pawl moves away from the spring allowing the holding pawl to move back against the ratchet wheel but on the back side of the tooth against which it formerly rested, and, as the handle moves further, glides down into contact with the face of the next

tooth. A further movement of the handle then releases the lever pawl and the device is ready to repeat the operation. Had it been considered advisable, Crooker could have eliminated the use of the spiral spring by moving the anchoring position of the especially formed spring a few millimeters along the frame further from the free end of the holding pawl and its action would have taught the action of the Wallace spring.

Anglemyer does not use this special Crooker-Dardani spring, but teaches the exact operation of all the other parts of the Wallace Patent.[11] What Wallace has done, therefore, is to take the Anglemyer Patent and add the Crooker-Dardani spring. Whether this represents patentability rests on whether something new and useful has been achieved.[12]

Appellee claims of the Wallace Patent that it " * * * involves a new combination of elements to produce a beneficial result by the use of simple parts which are accurate and stable in performance." It is well established that:

"A combination of old elements which accomplishes a new and beneficial result, or attains an old result in a more facile, economical, or efficient way, may be protected by a patent as securely as a new machine or composition of matter. [Seymour v. Osborne, 11 Wall. [516], 78 U.S. 516, 542, 548, 20 L.Ed. 33; Gould v. Rees, 15 Wall. [187], 82 U. S. 178, 187, 189, 21 L.Ed. 39; Thomson v. Citizens' National Bank, 8 Cir., 1892, 53 F. 250, 253] * * *."
3 Deller's Walker on Patent, § 482, p.

10. A first-class lever is pivoted between the pull and the weight. A second-class lever is pivoted at one end; the pull is on the other end and the weight is in-between. Webster's Dictionary.

11. Appellee contends here, as was urged before the patent examiner, that Anglemyer embodies an invention which had been conceived by Mr. Wallace and revealed to Mr. Anglemyer prior to the filing of the Anglemyer claim. We do not get to the merits of that contention. In considering the question of the patent-

ability of Wallace, we have merely indulged the presumption of the statute that Anglemyer is valid.

12. 35 U.S.C.A. § 101 (based on the Constitution, Art. 1, § 8) provides:
"Whoever invents or discovers any *new and useful* * * * machine * * * or any *new and useful improvement* thereof, may obtain a patent therefor, subject to the conditions and requirements of this title. July 19, 1952, c. 950, § 1, 66 Stat. 797." (Emphasis supplied.)

1728. See also Loom Co. v. Higgins, 1881, 105 U.S. 580, 591, 26 L.Ed. 1177. This court adheres to that rule. Jeoffroy Mfg., Inc., v. Graham, 5 Cir., 1955, 219 F.2d 511, 519.

Turning to the Wallace Patent, however, we are unable to find any new or beneficial result or any old result attained in a more facile, economical, or efficient way. It is still a winch with a drum which may be unwound one tooth at a time by means of a handle which operates on a simple ratchet principle by the use of a ratchet wheel and two pawls, the pawls being actuated by a spring.

We think nothing has been added and will come back to that thought later. Assuming, however, that something new has been added, it must be something that mere mechanical skill could not achieve. " * * * a mere carrying forward or new or more extended application of the original thought, a change only in form, proportions, or degree, the substitution of equivalents, doing substantially the same thing in the same way by substantially the same means with better results, is not such invention as will sustain a patent." Smith v. Nichols, 1874, 21 Wall. 112, 88 U.S. 112, 119, 22 L.Ed. 566. Congress has required that, even where something different has been invented, it is not patentable where it would have been obvious to a person "having ordinary skill in the art to which said subject matter pertains." [13]

Neither do we judge invention by hindsight. In 1881 Justice Bradley stated in Loom Co. v. Higgins, supra, 105 U.S. at page 591:

" * * * Now that it has succeeded, it may seem very plain to any one that he could have done it as well. This is often the case with inventions of the greatest merit. It may be laid down as a general rule, though perhaps not an invariable one, that if a new combination and arrangement of known elements produce a new and beneficial result, nev-

er attained before, it is evidence of invention."

Justice Bradley continued to ponder the principles involved in such cases, and during the next year he concluded:

"The design of the patent laws is to reward those who make some substantial discovery or invention, which adds to our knowledge and makes a step in advance in the useful arts. Such inventors are worthy of all favor. It was never the object of those laws to grant a monopoly for every trifling device, every shadow of a shade of an idea, which would naturally and spontaneously occur to any skilled mechanic or operator in the ordinary progress of manufactures. Such an indiscriminate creation of exclusive privileges tends rather to obstruct than to stimulate invention. It creates a class of speculative schemers who make it their business to watch the advancing wave of improvement, and gather its foam in the form of patented monopolies, which enable them to lay a heavy tax upon the industry of the country, without contributing anything to the real advancement of the arts. It embarrasses the honest pursuit of business with fears and apprehensions of concealed liens and unknown liabilities to lawsuits and vexatious accountings for profits made in good faith."

Atlantic Works v. Brady, 1882, 107 U.S. 192, 200, 2 S.Ct. 225, 27 L.Ed. 438. This conclusion by Justice Bradley is now a classic. 1 Deller's Walker on Patents § 27.

Appellee argues that we are bound by the findings of the trial court that the Wallace Patent is valid because such is a finding of fact. Mr. Justice Swayne, as early as 1874, in considering this question stated: " * * * the question presented for our determination is one rather of law than of fact." Smith v. Nichols, 1874, 21 Wall. 112, 88 U.S.

13. 35 U.S.C.A. § 103. The reviser's note states that this holding has been followed since 1850.

112, 118, 22 L.Ed. 566. This Court has stated as recently as 1955 that: " * * * the issue of whether a particular patent meets the requisite standard of invention essential to validity is now generally regarded as a fully reviewable question of law." Fritz W. Glitsch & Sons, Inc., v. Wyatt Metal and Boiler Works, 5 Cir., 1955, 224 F.2d 331, 335.[14]

While it may be true that the Wallace Patent has not been disclosed by any *one* patent in the prior art, one need only examine Crooker, Dardani and Anglemyer to find its every function disclosed. It makes no difference whether what preceded was covered by a patent or rested only in public knowledge, what resides in such domain may be appropriated.[15]

During oral argument, the appellee urged that Wallace was an improvement over Crooker in that it was safer. It was suggested that Crooker was dangerous because in hooking the Crooker spring to the pawl, or in removing it therefrom, the operator's fingers could get caught in the mechanism. This operation, however, as shown by the drawing in the Crooker Patent, was designed to be performed outside the frame and apparently involved no more danger than changing the bias of the handle pawl in Wallace. We do not believe that Wallace has contributed anything new or useful over Crooker, as far as safety is concerned.[16] Wallace may be more facile than Crooker but no more so than Dardani.

We are of the opinion that the Wallace Patent is not valid. The judgment is, therefore, reversed and the cause remanded with directions to enter final judgment for appellants, Little Mule Corporation, Aluminum Products, Inc. and William E. Housel.

Reversed and remanded with directions.

TUTTLE, Circuit Judge (dissenting).

With deference, I dissent. I would affirm the judgment of the trial court, finding the Wallace Patent valid and infringed.

---

14. Here, however, even should we be bound by a presumption of correctness of the trial court's findings, we should be of the opinion that the trial court relied too heavily upon an erroneous interpretation of the deposition testimony of the patent experts as to the validity of the patents in suit. We have these same depositions before us and, although there was some personal testimony by experts, their credibility is not questioned. We also have before us the patents involved, the patents in the prior art and the devices manufactured under the Wallace and the Du Bois Patents.

15. Smith v. Nichols, 1874, 21 Wall. 112, 88 U.S. 112, 119, 22 L.Ed. 566.

16. Safety also involves freedom from mechanical failure. While the point is not developed in the testimony, we think that a general knowledge of the laws of physics and mechanics enables us to recognize that in designing springs, metal fatigue is a problem that must be considered in order to prevent mechanical failure. The more stress and distortion a spring is required to undergo, the more apt it is to develop metal fatigue. In Wallace the part of the spring in the vicinity of the end which is anchored to the frame undergoes severe stresses. Furthermore, it appears that if fatigue failure should develop the holding pawl might be thrown clear of the teeth of the ratchet wheel and the load would crash, because no safety factor has been provided. If the holding pawl were on top of the ratchet wheel, or since it is underneath, if it were heavily counterweighted, gravity would force its free end against the ratchet wheel, and the design would be safer. As between Wallace and Du Bois, it appears that Du Bois is probably better, since the Du Bois springs biasing the holding pawl against the ratchet wheel are subject to only slight distortion. It also appears that, strictly from the standpoint of safety considerations, Wallace would be improved by the addition of a separate spring to bias the holding pawl toward the ratchet wheel. We are persuaded, therefore, that in so far as safety is concerned, Wallace has not contributed anything new and useful over Crooker.