**UNITED STATES PIPE AND FOUNDRY COMPANY, a corporation, Plaintiff,**

v.

**JAMES B. CLOW & SONS, INC., a corporation, Defendant.**

Civ. A. No. 9813.

United States District Court
N. D. Alabama, S. D.

Feb. 19, 1962.

Hugh P. Carter of Jennings, Carter & Thompson, and Peyton N. Finch, Jr., Birmingham, Ala., for plaintiff.

Lange, Simpson, Robinson & Somerville, Birmingham, Ala., MacLeish, Spray, Price & Underwood, and Byrom, Hume, Groen & Clement, Chicago, Ill., for defendant.

GROOMS, District Judge.

This cause coming on to be heard on the testimony and exhibits of plaintiff's and defendant's witnesses, and on the arguments and briefs of plaintiff's and defendant's counsel; and the Court, being fully advised, enters the following findings of fact and conclusions of law:

FINDINGS OF FACT

1. This is a suit brought under the Patent Laws of the United States by the plaintiff, United States Pipe and Foundry Company, a corporation organized and existing under the laws of New Jersey, having its principal place of business in Birmingham, Alabama, against the defendant, James B. Clow & Sons, Inc., a corporation organized and existing under the laws of Delaware, having its principal offices in Chicago, Illinois, and a place of business in Birmingham, Alabama, for the infringement of United States Letters Patent No. 2,953,398, issued on September 20, 1960, on an application filed May 28, 1956, in the names of Lawrence T. Haugen and Carl A. Henrikson, assignors to the plaintiff of the entire right, title and interest in said application and patent. Plaintiff now owns, and has since its issuance been the owner of, said Letters Patent.

2. The patent in suit (No. 2,953,398) relates to pipe joints of the character used for connecting together sections of pipes, either of the bell-and-spigot type, or the plain-end type wherein a sleeve-type coupling is utilized. The invention is applicable to pipes made of metal, ceramic material, concrete, cement-asbestos, plastic, or other compositions.

3. The patent in suit discloses a joint by which pipe in size at least up to 24 inches in inside diameter may be connected to withstand pressure up to bursting strength of the pipe without machining either the bell or spigot, and by merely pushing the end of the spigot into the bell. It is especially adapted for joining pipes in which a wide range of dimensional tolerances must be accepted. The utility of the patent in suit is such that it permits the pipe to deflect in the joints after the two pieces are assembled without damage to or overstressing the gasket and without breaking the seal to the degree required in practice. The joint disclosed by this patent can be assembled with pipes positioned up to a 5 degree angle out of axial alignment to each other, without displacing the gasket; consequently, it is not necessary to pre-align the pipes with any degree of accuracy. This also permits use in a curved ditch.

4. The plaintiff and the defendant are major producers of cast iron pressure pipe, and as such are competitors in the

142

sale of same. Prior to the patent in suit both plaintiff and defendant were making and selling commercially pipe joints for joining cast iron pressure pipe known in the trade as (1) mechanical joint type, (2) flange type, (3) bell-and-spigot type, and (4) roll-on type. As shown by plaintiff's exhibit 7, the joint disclosed by the patent in suit, and referred to as push-on type, is equal or superior to the types of joint set out above in all respects except resistance to separation. The economy of manufacture, the elimination of numerous accessories, and the ease of installation by unskilled labor, all demonstrated in plaintiff's exhibit 7, have skyrocketed sales of cast iron pressure pipe incorporating the joint of the patent in suit to a point far exceeding the combined sales of all other types of joints.

5. The plaintiff has commercialized the joint of the patent in suit under the trademark "Tyton Joint" and the joint actually commercialized is made in accordance with the form of joint shown, described and claimed in the patent, specifically Figures 1 to 4, inclusive, thereof.

6. The patent in suit shows, in Figure 6, a form of joint in which instead of having a metal ring or protuberance indicated at 9 in Figure 2 and formed of metal inside the bell, has a groove indicated at 10 in Figure 6 into which a corresponding bead formed on the gasket is adapted to seat.

7. Both of the species of the invention shown in Figures 1 to 4, inclusive, on the one hand, and that shown in Figure 6, on the other hand, operate in substantially identical manner, with substantially identical means, to achieve substantially identical results, among which may be mentioned the fact that the ridge or bead 9 in the form of Figures 1 to 4, and groove 10 and ridge 37 on the gasket in the form of Figure 6, both serve the function of holding the respective gaskets against internal movement when the spigots indicated at 2 in the drawings are pushed home in making up the joints.

8. The joint of the patent in suit, namely, the form of Figures 1 to 4 and the form of Figure 6, both seal the pipes against leakage by the rubber in the sealing part numbered, respectively, 12 in Figures 1 to 4, and 13 in Figure 6, being placed under radial compressive force upon insertion of the spigot.

9. While the application resulting in the issuance of the patent in suit was pending, the applicants Haugen and Henrikson filed in the United States Patent Office, on April 1, 1957, an application identified as Serial No. 649,746, as a continuation-in-part of the application resulting in the patent in suit. Application Serial No. 649,746 disclosed a joint for pipes and differed from the application resulting in the patent in suit in that it specifically claimed a joint in which the rubber forming the gasket was the same hardness throughout.

10. As shown by the file wrapper of the patent in suit, page 146, the Examiner required the applicants to abandon application Serial No. 649,746, for the reason that the Examiner considered the application resulting in the patent in suit to contain a disclosure of a gasket of single hardness and thereby sufficient to support claims broad enough to cover joints in which the gaskets thereof were of either single or dual hardness. The Board of Appeals of the Patent Office concurred in this holding. The Court specifically finds that the application of the patent in suit disclosed a pipe joint in which the gasket was of a single hardness rubber.

11. The defendant's joint that is accused by the plaintiff is sold under its proprietary name "Bell-Tite" and is the subject of Patent No. 2,898,131, issued on August 4, 1959 on application filed February 4, 1958, by Ralph W. Kurtz, assignor to defendant. The defendant has manufactured and marketed pipe having the Bell-Tite joint from the Spring of 1957 through September 20, 1960 (date of issue of patent in suit) and up to about November, 1960. The defendant's pipe joint during this time, and referred to hereinafter as the "old Bell-Tite", was manufactured in accordance with and in the form typified by

plaintiff's exhibit 3 and Figure 1 of plaintiff's exhibit 22.

12. In about November, 1960, after this suit was filed, the defendant removed the annular ledge of metal inward of the bell having a radial face confronting the lip, and commenced to manufacture and offer for sale pipe embodying joints with a relatively open and unobstructed bell (which will hereinafter be referred to as the "new Bell-Tite"), and shown in plaintiff's exhibit 4 and Figure 2 of plaintiff's exhibit 22.

13. In both the old Bell-Tite and the new Bell-Tite joints the defendant has always used a gasket of single or monolithic hardness throughout its structure in sizes up to and including 12 inches in diameter; in both the old and the new Bell-Tite joints in sizes above 12 inches in diameter the defendant has always used gaskets therefor in which the heel or anchoring part was of harder rubber than the inner or sealing part. However, no material change was made in the gaskets for use in given sizes of the new Bell-Tite compared with those used in the old Bell-Tite; in fact, the gaskets are interchangeable, size for size, as between the old Bell-Tite and the new Bell-Tite joints. The gaskets employed by defendant in its Bell-Tite joints are material parts thereof and none of them are staple articles of commerce suitable for substantial non-infringing use.

14. After thorough examination of the physical models of the new and old Bell-Tite joints of the defendant, and after consideration of the testimony of experts on both sides, the Court concludes that the elimination of the annular ledge above referred to is the only difference between the old and the new Bell-Tite joints of the defendant, and that this elimination has no effect upon the operation, function, results obtained, or the overall efficacy of the joints manufactured and sold by the defendant. The Court further finds:

(a) That both the old and the new Bell-Tite joints are capable of sufficient deflection after assembly to perform the job at hand;

(b) That both the old and new Bell-Tite joints are capable of assembly under the degree of deflection required to do the job;

(c) That the gasket is anchored by the coaction of the rib on the front or anchoring part of the gasket with axial walls of the grooves therefor in the bells in both the old and new Bell-Tite joints in a manner adequate to assure that the gaskets do not slip inwardly of the grooves even upon insertion of the largest diameter spigot into the smallest diameter bell, throughout the permissive range of tolerances for as-cast, cast iron pressure pipe;

(d) In both the old and new Bell-Tite joints no machining of either the spigot or the bell parts is required to make a commercially practical and entirely satisfactory pipe joint for all sizes up to and including 24 inch diameter;

(e) Both the old and new Bell-Tite joints of the defendant are capable of withstanding the pressures to which such joints are normally subjected in the normal use for which such pipes and the joints therefore are designed, and, the presence or absence of the triangular ledge or annulus of metal has no effect upon the pressure that the Bell-Tite joints will stand.

15. As late as June 9, 1961, the defendant, while offering for sale only the new Bell-Tite joint, used advertising brochures and a sectional model depicting the old Bell-Tite joint. This was done at the American Water Works Association Convention held in Detroit, Michigan, on or about said date. The Court considers this significant as indicating that defendant does not itself consider the old and new Bell-Tite joints to be materially different in any respect.

16. In view of the above, the Court concludes that the sloping wall at the inner end of the gasket groove resulting from the elimination of the triangular cross-sectioned, annular band of metal in

the new Bell-Tite joint provides a joint which is the full mechanical equivalent of the old Bell-Tite joint. Therefore, the Court finds in claims such as claim 1 of the patent in suit, where the gasket groove is delineated on its "opposite end" by a "generally radially extending opposite wall," such claim as so limited reads on both the old and new Bell-Tite joints of the defendant inasmuch as the sloping wall is in point of fact the full mechanical equivalent, in the claimed combination, of a "generally radially extending opposite wall." Therefore, under the doctrine of equivalents, the Court finds that (a) claim 1 reads on both the old and the new Bell-Tite joints in all sizes, and (b) claims 2 and 4 read on both the old and the new Bell-Tite joints in sizes above 12 inches.

17. The Court also finds that the defendant's old and new Bell-Tite joints meet every requirement of each of the claims in suit, and each and every element of the claims are found in exactly the same setting and relation in the accused structures of the defendants in the sizes indicated as follows:

(a) Claim 1 is infringed literally by the old Bell-Tite joint, all sizes thereof.

(b) Claim 2 is infringed literally by the old Bell-Tite joint in sizes above 12 inches.

(c) Claim 4 is infringed literally by the old Bell-Tite joint above 12 inches in size.

(d) Claim 5 is infringed literally by all sizes of both the old and the new Bell-Tite joints.

(e) Claim 7 is infringed literally by both the old and the new Bell-Tite joints in all sizes.

(f) Claim 8 is infringed literally by the old and the new Bell-Tite joints in sizes above 12 inches.

18. The Court, after due consideration of the testimony and claims in suit, finds the claims to be unambiguous and to point out distinctly the inventions disclosed in the drawings and specifications of the patent in suit.

19. During the pendency in the Patent Office of the patent in suit an interference was declared between the application of the patentee here and application of Yves Mathieu of Brazil, the latter being Serial No. 587,365, filed in the United States Patent Office on May 25, 1956. The interference was declared January 20, 1960, numbered 90,801, and involved claim 35 of the application, which is claim 5 of the patent in suit. Mathieu was the senior party to said interference, having filed his application three days prior to the application of the patent in suit, with intent to rely on two earlier filed Brazilian applications, No. 80,940, filed on July 25, 1955, and No. 81,987, filed on September 15, 1955. The materiality of the latter filing date was not urged as pertaining to the issues herein.

20. After negotiations, the interference was settled by a disclaimer of the count or invention of the interference filed by Mathieu and his assignee. The evidence does not disclose that plaintiff made representations of any nature to the Patent Office in connection with the filing in or acceptance by the Patent Office of the aforesaid disclaimer. On the contrary, it appears that under the practice before the Patent Office in connection with the filing of a disclaimer no statements or representations are required or permitted. The Court, therefore, further finds that the plaintiff, its attorneys, and Haugen and Henrikson did not make any fraudulent, unwarranted or untruthful statements to the Patent Office or to Mathieu or his assignee in connection with the settlement of said interference and that neither of them withheld any facts which should have been divulged, and further finds that they acted in a lawful and proper manner in obtaining the disclaimer, and their conduct can in no way be construed to warrant a conclusion that they acted in a fraudulent manner.

21. The file wrapper of the patent in suit, at page 139, discloses that while claim 35 (which is claim 5 herein) was being requested of the Patent Office, the

attorney handling the application on behalf of Haugen and Henrikson made the statement that "all of the claims in the case specify that the elongated groove is defined by a generally axially extending wall and generally radially extending walls." However, claim 35 of the patent did not call for a "generally radially extending wall(s)" at the time such statement was made, although claim 1, 2, 3 and 4 did call for the "radially extending wall." There is nothing in the file wrapper from which an inference can be drawn that the Patent Office relied upon this statement or was influenced by it in allowing claim 35 which calls for a "wall extending toward said inner pipe section." The defendant's expert witness Burns, who had studied the file wrapper, stated that there was nothing in the file wrapper itself to indicate that the Patent Office relied upon this statement of the attorney in allowing claim 35. The file wrapper further reveals that claim 35 was not allowed by the Examiner to whom said statement was made, as it was only allowed after appeal to the Board of Appeals in the Patent Office. It appears, and the Court finds, that the Board of Appeals understood the details of the wording of all of the claims, including claim 35, prior to their allowance.

22. The Court finds that no claim commensurate in scope with the claims in suit was cancelled by the applicants pending the prosecution of the application of the patent in suit, and no attempt has been made by the plaintiff to have the Court interpret the claim in suit to be of a scope the same as or greater than the scope of a cancelled claim.

23. The following patents were relied upon by the defendant as anticipating the patent in suit: No. 2,505,863, Keech, May 2, 1950; 2,398,399, Alexander, April 16, 1946; 566,470, Rickets, August 25, 1896; British patent No. 581,962 issued October 31, 1946; French patent No. 631,120 issued December 15, 1927; Italian patent No. 514,072 published May 8, 1955.

24. Of the patents just listed the Keech patent was considered by the Examiner who handled the applicant's abandoned application, Serial No. 649,746. Therefore, and, although the Keech patent is not listed as one of the patents cited against the patent in suit, the Court concludes that the Keech patent is "of record" in the file of the application of the patent in suit for all practical purposes. The Alexander patent was called to the attention of the Examiner by the applicants themselves.

25. After a careful study of each of these patents taken with the testimony concerning the same by Mr. Burns and the testimony concerning the same by Mr. Henrikson, the Court finds that none of the claims in suit of patent 2,953,398, read upon any single one of the references listed above and claimed by defendant to be anticipations. Specifically, and taking claim 5, which is the broadest claim of the patent, as an example, Keech does not have the combination of the gasket groove as defined in claim 5, together with a two-part gasket, both of which parts are fitted in the groove, together with means cooperating between a part of the gasket adjacent the opening of the outer pipe member and an adjacent wall of the groove for securing the gasket against axial movement of translation relative to the groove during assembly of the pipe joint. By physical demonstration, plaintiff's exhibits 67 and 67A, the Court readily saw that whatever the function of the groove 4 of Keech is, it does not serve the function of holding the gasket of Keech against slipping inwardly upon assembly of the joint. Furthermore, the Keech joint, if made according to the teachings of the Keech patent, is entirely impractical and unsatisfactory for joining large diameter pipe, such as sizes 4 to 24 inches in diameter.

26. Alexander patent No. 2,398,399 is not an anticipation of the claims in suit because such means as there may be in Alexander to prevent inward movement of the gasket upon assembly of the spigot resides in the engagement of the *inner-*

*sealing end* of the gasket against a shoulder as distinguished from engaging an *outer holding part* of the gasket with some means in an adjacent axial wall of the gasket groove to hold the gasket while the spigot is being inserted.

27. Rickets patent No. 566,470 discloses a water closet connection. No testimony was offered at the trial concerning this patent. However, the Rickets patent does not disclose a joint which meets the terms of any of the claims of the patent in suit, including claim 5 thereof.

28. Particularly Figure 5 of British patent No. 581,962 was relied upon by defendant. This patent discloses a tapered end on the spigot, a tapered surface in the bell and a tapered gasket. From the combined testimony of the experts in the case, the Court finds as a fact that this patent does not disclose a structure in which there can be found all of the elements of any claim in suit.

29. French patent No. 631,120 does not anticipate any of the claims in suit because the lip sealing portion is not under radial compressive force to the extent required to effect a seal between the inner and outer pipe sections. Rather, this patent relies upon internal pressure of the fluid in the pipe to force the lips against the inner pipe to make the seal. Further, this gasket is not elongated in an axial direction and the joint shown in this patent does not have the overall organization of parts as claimed in the patent in suit.

30. Italian patent No. 514,072 does not anticipate because the gasket thereof does not have two axial parts, one of which is a holding part and the other of which is a sealing part. Further, the parts of the gasket are not physically or structurally related to each other and to the gasket groove in the manner set out in the claims in suit.

31. In paragraph 4 of the notice the defendant cited 21 additional patents and one publication in an effort to show that what the patent in suit discloses and claims is obvious to a person having ordinary skill in the art, within the meaning of 35 U.S.C.A. § 103. Of these additional patents those to Bille, Marx, Nathan (2 patents), McWane No. 2,245,154, and Moore were considered by the Patent Examiner handling the application of the patent in suit. None of the patents cited by defendant, either as anticipations or to show the state of the art, are as pertinent as those considered by the Patent Office. Such of these additional patents as were specifically called to the Court's attention have been carefully considered. Certain of these structures were physically produced and tested by the plaintiff and the results of those tests were unquestioned. In effect, patents such as McWane patent No. 2,245,-154 are believed not to be operative when using pipe having wide variations in size and it is doubtful that it is operative for machined pipe because of the fact that deflection ordinarily encountered after assembly of the joint would destroy the gasket by cutting the tail portion numbered 16 in the drawing of Figure 2 of that patent. Such action was demonstrated by plaintiff in a physical McWane joint. Such patents as Pierce No. 1,945,293 are of the "lip seal" type wherein the fluid under pressure forces the lips against the inner and outer pipes to effect the seal. Therefore, there is no radial compressive force in the sealing part. Pierce and like joints permit water to pass *into* the pipe if outside pressure exceeds inside pressure; for instance, where a pipe line lies in a water-filled ditch or is laid under a stream and is drained of internal fluid.

32. The Court has carefully considered all of the patents cited and in view of the evidence as a whole, none of them, singularly or in combination, leads the Court to the conclusion that the invention of the patent in suit would have been obvious at the time it was made to a person having ordinary skill in the art. Some of these patents are owned by present licensees of the plaintiff under the invention of the patent in suit. For instance, the McWane patent, since its issuance in 1941, apparently has always

been available for use by a present licensee of plaintiff; a German patent, counterpart of Marx, U. S. Patent No. 2,116,705 was stipulated to be owned by a licensee of plaintiff under plaintiff's corresponding German patent; British patent No. 581,962 shows on its face to have been issued to a French licensee of plaintiff; the Nathan patents Nos. 2,-230,725 and 2,272,811 were admitted by their designer, Mr. Nathan, in an affidavit of record in the file wrapper of the patent in suit, to be impractical for use in every day operations.

33. The Court finds as a fact that the invention of the patent in suit has filled a longfelt want for a better pipe joint and that the need for a better pipe joint was known not only to the defendant in this case but also to other substantial pressure pipe manufacturers in the United States. This fact was accentuated by competition from the cement-asbestos industry which had developed and commercialized a pipe embodying a joint which could be produced at a cost far less than cast iron pressure pipe. The patentees, Haugen and Henrikson, experimented over a period of some four years before finally inventing the joint of the patent in suit.

34. The Court finds that despite the knowledge of the existence of the problem, no one in the industry, including defendant, solved all of the problems which the invention of the patent in suit has solved, including, but not limited to, a joint which may be assembled with unskilled labor; a joint which may be assembled without machining the parts and which is capable of producing a good and effective joint throughout the usual large range of tolerances encountered in certain pipe such as as-cast, cast iron pressure pipe; a joint which is economical and fool-proof in operation; a joint which can be assembled with the two pipes to be joined lying with their axes out of alignment; a joint which when assembled can deflect to the degree required to accommodate the pipe to unevenness of the ditch, shifting of the ground, etc.

35. The defendant did not offer the accused pipe joints to the trade until after it learned of the details of plaintiff's joint. Mr. Kurtz, who designed the defendant's Bell-Tite joints, learned of plaintiff's joint about the latter part of 1956, prior to doing any work on designing the Bell-Tite joints.

36. The weight of the evidence leads the Court to find that defendant copied the commercial form of plaintiff's joint, with only minor, inconsequential variations.

37. Mr. Kurtz made application for a patent on the defendant's joints, which application was assigned to the defendant. This patent was issued as No. 2,-898,131 on August 4, 1959. Against that application were cited McWane patent No. 2,245,154, Marx patent No. 2,116,-705, Bihet patent No. 1,924,020, Nathan patent No. 2,272,811, Keech patent No. 2,505,863, and French patent No. 806,-525, all of which are here relied upon by defendant. Defendant, in arguing for patentability of its Kurtz joint, convinced the Patent Office that none of the foregoing patents should prevent the issuance of its patent. The arguments and remarks in that proceeding concerning disclosure, operation and efficiency of particularly the said McWane, Keech and Marx patents were contrary in major respects to the position the defendant now takes with respect to the named patents and their bearing upon the patent in suit in the same respects.

38. The defendant offered, and the Court admitted for the limited purpose of evidence of obviousness, under 35 U.S. C.A. § 103, a drawing, defendant's exhibit 16, made by Mr. Bevington. The undisputed testimony is that no joint according to said drawing was ever made, even experimentally. Mr. Bevington, on or about the date of the drawing, showed it to Mr. Hunter Phillips, Chief Engineer of defendant. Nothing was done toward testing or utilizing the structure there shown. Under these circumstances, the Court finds that even if the drawing shows the joint of the patent in suit, neither Mr. Bevington nor Mr. Phillips,

both skilled in the art, perceived the importance, practicality or utility of the same, and hence such drawing alone does not demonstrate that the invention of the patent here in suit was obvious within the meaning of 35 U.S.C.A. § 103.

39. The invention of the patent in suit has enjoyed instantaneous, spontaneous, world-wide acceptance in the trade.

40. The invention of the patent in suit has virtually eliminated the production and sale by all in the industry of the so-called roll-on joint; it has supplanted a large portion of the sales of the mechanical and bell and spigot joints; it has increased in yearly sales insofar as plaintiff's operation is concerned from nothing in 1955 to the following percentages of plaintiff's total production by years to date:

| 1956 – | 2 % |
| 1957 – | 33.7% |
| 1958 – | 48.5% |
| 1959 – | 60.3% |
| 1960 – | 66.2% |
| 1961 – | 71.1% (through April) |

41. Since the defendant first offered its Bell-Tite joints in about April, 1957, they have steadily increased in sales at the expense of the said other joints offered by defendant until by June, 1961, the Bell-Tite joints account for about 70% of defendant's total pipe sales.

42. In like manner, throughout the industry in the United States, and since plaintiff introduced the joint of the patent in suit, the overall average production of joints of the patent in suit by plaintiff and its licensees, and including those of the defendant and three others who are licensed by defendant under its Kurtz patent and whom the plaintiff is suing for infringement of the patent here in suit, amounts at the present to about 63% of the total production.

43. The success of the invention of the patent in suit has been obtained without any material increase in advertising, sales effort, or expenditures on the part of the plaintiff. Plaintiff's expenditures for advertising since the joint has been introduced have amounted to a yearly average of less than eight one-hundredths of one per cent (.08%) of plaintiff's total sales of pipe embodying the joint of the patent in suit.

44. The plaintiff has made application for patent on this same invention in some 35 foreign countries. As of the date of the trial, 28 of the foreign countries had granted patents and in none of the remaining countries had a patent on the invention been finally denied.

45. The plaintiff has licensed six of the twelve producers of cast iron pressure pipe in the United States on a nondiscriminatory basis and at a royalty rate of 30 cents per ton for pipe produced in sizes up to and including 12 inches and 15 cents per ton for pipe produced in sizes above 12 inches. Based on the current average sales price of $120.00 per ton, this is an average royalty of 0.19%. Of the twelve producers of cast iron pressure pipe in the United States, six have taken licenses, one has a joint of its own design, and the plaintiff is suing four of them, counting the present defendant, for infringement of the patent in suit. Substantial companies the world over have taken licenses under corresponding foreign applications and patents, including companies in England, France, West Germany, the Scandinavian countries, Japan, Canada and Australia.

46. Every finding of fact deemed a conclusion of law is hereby adopted as a conclusion of law.

## CONCLUSIONS OF LAW AND OPINION

The issues to be decided by the Court dispositive of this case are (1) infringement and (2) validity of the patent. Logically, it would seem since infringement presupposes validity that validity should be the first order of decision. However, this pretermits the language of the first paragraph of Title 35 U.S.C.A. § 282, which reads as follows:

"A patent shall be presumed valid. The burden of establishing invalidity of a patent shall rest on the party asserting it."

Therefore, infringement with its inherent burden on the plaintiff will be considered first.

## INFRINGEMENT

■ From the evidence and argument of counsel, the Court concludes that the fact of infringement of the old Bell-Tite joint is not seriously contested. There seems to be no valid contention that the defendant's old Bell-Tite joint does not infringe all claims of the patent in suit.[1] On the contrary, defendant admits that the "annular ledge of metal" constituting the difference between the old and the new Bell-Tite joint was removed to avoid infringement. The issue as thus drawn in this regard is whether or not defendant accomplished this end with reference to the new Bell-Tite joint.

The Court in its findings of fact hereinabove has held that the new Bell-Tite joint is the full mechanical equivalent of claims 1, 2 and 4 of the patent in suit, and applying the doctrine of equivalents[2] concludes that it reads on claims 1, 2 and 4 of the patent in suit.

■ The Court has further held that claims 5, 7 and 8 were literally infringed by both the old and the new Bell-Tite joints of the defendant. It follows that the plea of file wrapper estoppel to claim 5 is without application under the authority of Smiths America Corp. et al. v. Bendix Aviation Corp., D.C., 1956, 140 F.Supp. 46, D.C.Dist.Columbia, aff'd 101 U.S.App.D.C. 299, 248 F.2d 621, where the Court said:

"Defendant, in its defense to the claim asserted against it by plaintiffs that defendant used inventions of plaintiffs covered by the patents in question, has relied heavily on the doctrine of File Wrapper Estoppel. But the Court is of the opinion that no question of File Wrapper Estoppel arises unless it can be shown that it is necessary to go beyond the ordinary and accepted meaning of the words in the allowed claims, and not even then unless it can be shown that plaintiffs must resort to the doctrine of equivalents. Therefore,

1. The law applicable to the facts of this case is clearly and definitely set forth by the United States Supreme Court in Graver Tank & Mfg. Co. v. Linde Air Products Co., 339 U.S. 605, 70 S.Ct. 854, 94 L.Ed. 1097, decided May 29, 1950. In that case it was stated as follows:
"In determining whether an accused device or composition infringes a valid patent, resort must be had in the first instance to the words of the claim. *If accused matter falls clearly within the claim, infringement is made out and that is the end of it.*" (Emphasis supplied.)

2. In Graver Tank & Mfg. Co., Inc. v. Linde Air Products Co., supra, note 1, the Court said:
"The essence of the doctrine is that one may not practice a fraud on a patent. Originating almost a century ago in the case of Winans v. Denmead, 15 How. 330 [14 L.Ed. 717], it has been consistently applied by this Court and the lower federal courts, and continues today ready and available for utilization when the proper circumstances for its application arise. 'To temper unsparing logic and prevent an infringer from stealing the benefit of an invention' a patentee may invoke this doctrine to proceed against the

producer of a device 'if it performs substantially the same function in substantially the same way to obtain the same result.' Sanitary Refrigerator Co. v. Winters, 280 U.S. 30, 42 [50 S.Ct. 9, 74 L.Ed. 147]. The theory on which it is founded is that 'if two devices do the same work in substantially the same way, and accomplish substantially the same result, they are the same, even though they differ in name, form, or shape.' [Union Paper-Bag] Machine Co. v. Murphy, 97 U.S. 120, 125 [24 L.Ed. 935] * * *"
In Matthews v. Koolvent Metal Awning Co., 5 Cir., 158 F.2d 37, at p. 40, the Court, speaking through Judge Hutcheson, said:
"The doctrine of equivalency has never been a mere dry bones doctrine. Put forward to do justice and prevent defrauding by dissimulation and deceit, it should be, it has been, applied to give its equitable purpose effect. Not at all recondite or difficult of understanding or application, it is the mere expression and application of the view that like things are alike and that they are not made unlike by formal and nonsubstantial changes, no matter how cunningly contrived the dissimulation, how clever the changes in form. * * *"

since the Court has determined, as stated above, that the claims in plaintiffs' patents read directly on defendant's sextant, it is unnecessary for plaintiffs to resort to the doctrine of equivalents. Thus the authorities cited by defendant under its defense of File Wrapper Estoppel have no applicability in this case. See and Cf. Lewis v. Avco Mfg. Corp., 7 Cir., 228 F.2d 919; Keith v. Charles E. Hires Co., 2 Cir., 116 F.2d 46; Southern Textile Machinery Co. v. United Hosiery M[ills] Corp., 6 Cir., 33 F.2d 862; R. Hoe & Co. v. Goss Printing Press Co., 2 Cir., 30 F.2d 271."

It follows that defendant's plea of file wrapper estoppel to claim 5 can only be premised on the theory that there is no literal infringment. But, assuming that there is no literal infringement, the defense of file wrapper estoppel is likewise unavailable in this case.

The defendant's contention with regard to file wrapper estoppel is based upon the statement by plaintiff's counsel before the Patent Examiner that "all of the claims in the case specify that the elongated groove is defined by generally axially extending wall and generally radially extending walls." This was not true, since claim 35 (claim 5 of the patent here sued on) did not call for "generally radially extending wall(s)", although claims now numbered 1, 2 and 4 did call for "radially extending wall(s)."

■ The doctrine of equivalents may not be resorted to in an attempt to secure through its use that which is rejected by the Patent Office or withdrawn in the face of possible rejection, since file wrapper estoppel would supersede and bar its application. As stated in Toy Ideas, Inc. et al. v. Montgomery Ward & Co., Inc., D.C.Md., 172 F.Supp. 878, 882:

"The doctrine of file wrapper estoppel applies only where by amendment of the claims in the Patent Office the patentee gives up an element by reason of prior art which is later sought to be recaptured. File wrapper estoppel bars recourse to the doctrine of equivalents in cases where the patentee attempts to secure through equivalents what has been rejected by the Patent Office. 'When claims are rejected and withdrawn while an invention is pending in the Patent Office the patentee is estopped to contend that the allowed claims should be given the same breadth and interpretation as the abandoned claims.' Baker-Cammack Hosiery Mills v. Davis Co., 4 Cir., 181 F.2d 550, 563. See Schriber-Schroth Co. v. Cleveland Trust Co., 311 U.S. 211, 221, 61 S. Ct. 235, 85 L.Ed. 132; Exhibit Supply Co. v. Ace [Patents] Corp., 315 U.S. 126, 136, 62 S.Ct. 513, 86 L. Ed. 736. When an amendment is made to meet an examiner's objection, the applicant proclaims his abandonment of all that is embraced in the difference between the original and the amended claim. Carter Products, Inc. v. Colgate-Palmolive Co., D.C.D.Md., 164 F.Supp. 503, 519. This rule of estoppel is not applicable in the case at bar because the file wrapper for the Senior patent shows that *the patentee did not give up any element of his combination to meet any objection of the Patent Office examiner and did not surrender any coverage which is here sought to be recaptured under the doctrine of equivalents.*" (Emphasis supplied.)

See also language of the Court in Edward Valves, Inc. v. Cameron Iron Works, 5 Cir., 286 F.2d 933, 943, headnote 14.

■ As noted in Toy Ideas, Inc., supra, if the patent applicant narrows his claim either by amendment or by advocating a particular interpretation in an attempt to secure its allowance, he will thereafter be estopped to contend for a construction of the claim to give it the same meaning which it would have without the amendment or limited interpre-

tation. As stated in Straussler v. United States, Ct.Cl., 290 F.2d 827, 830:

> "Estoppel in patent law is simply an application of familiar equitable principles to the technique of Patent Office prosecution and patent infringement litigation. A person in an infringement suit may not take a position inconsistent with the one he maintained before the Patent Office in the proceedings which led to the issuance of his patent. * * "

The decisions clearly show that the patentee must change his position before the Patent Office either by amendment or advocation of a limiting construction which would work an implied disclaimer in order to invoke an estoppel. Pertinent to the facts in issue is the statement of the Court in Keyes Fibre Co. v. Chaplin Corp., D.C. Me., 97 F.Supp. 605, 613:

> "The law is clear that this Court cannot look to the arguments of counsel to the Patent Office to establish estoppel of the patentee as to the scope of allowed claims, where no change in the claims has resulted from that argument. Catalin Corp. of America v. Catalazuli Mfg. Co., 2 Cir., 1935, 79 F.2d 593, 594; Boyer v. Keller Tool Co., [3 Cir.,] 127 F. 130, 134; Jacquard Knitting Machine Co. v. Ordnance Gauge Co., D.C.E.D.Pa., 1951, 95 F.Supp. 902, 908; See Firestone Tire & Rubber Co. v. United States Rubber Co., 6 Cir., 1935, 79 F.2d 948, 961. * * "

In the case at bar the representations by plaintiff through its counsel was made to the Patent Examiner who subsequently rejected all claims. Plaintiff's counsel testified that he was simply mistaken with respect to the statement, and it was not repeated or urged before the Patent Office Board of Appeals. The Board of Appeals thereafter allowed all claims here in suit which had been rejected by the Patent Examiner without change, amendment or modification.

The patentee in this case, by appealing, pursued the path marked by Judge Thomsen, in Carter Products, Inc. et al. v. Colgate-Palmolive Co. et al., 164 F. Supp. 503, 520, where it was said:

> "The patentee is estopped not because of the prior art but because of his acquiescence in the examiner's position as to what the prior art permitted. 'If dissatisfied with the rejection he should pursue his remedy by appeal; and where, in order to get his patent, he accepts one with a narrower claim, he is bound by it.' I. T. S. Rubber Co. v. Essex Rubber Co., 272 U.S. 429, 443, 47 S.Ct. 136, 141, 71 L.Ed. 335."

There is no evidence that the Patent Office Board of Appeals relied on the earlier statement to the Patent Examiner. On the contrary, the evidence is to the effect that, and the Court has held, the claims were unambiguous, and as such were fully understood by the Board of Appeals. Therefore, file wrapper estoppel is not applicable in this case, regardless of the ruling as to literal infringement of plaintiff's claim 5.

### VALIDITY OF PATENT

Having disposed of the question of infringement of both the old and the new Bell-Tite joints and also the plea of file wrapper estoppel, the Court next turns to a determination of the validity of the patent in suit. Title 35 U.S.C.A. § 282, enacting a presumption of validity and set out above, became law in 1952, thereby codifying the case law as represented by such cases as Mumm v. Jacob E. Decker & Sons, 301 U.S. 168, 57 S.Ct. 675, 81 L.Ed. 983. The purpose of the enactment is stated by Judge Hand, in Reiner v. I. Leon Co., 2 Cir., 285 F.2d 501, as follows:

> "There can be no doubt that the Act of 1952 meant to change the slow but steady drift of judicial decision that had been hostile to patents which made it possible for Mr. Justice Jackson in dissent to speak of the 'strong passion in this Court for striking them' (patents) 'down so that the only patent that is valid is one which this Court has not been

able to get its hands on.' Jungersen v. Ostby & Barton Co., 335 U.S. 560, 572, 69 S.Ct. 269, 274, 93 L.Ed. 235.

The necessity for this presumption is made clear when it is borne in mind that judges, in most instances, are inexperienced in the complex technical aspects present in patent litigation. As stated in Moon et al. v. Cabot Shops, Inc., 1959, 9 Cir., 270 F.2d 539, 541:

> "A presumption of validity arises from the issuance of a patent. The presumption is predicated upon the expertness of the Patent Office acting within its specific field, and can be overcome only by clear and convincing proof. The burden of proof in such cases is upon the party attacking the patent, and reasonable doubts must be resolved in favor of validity. See Patterson-Ballagh Corp. v. Moss, 9 Cir., 201 F.2d 403, 406."

Anything short of this presumption would enable the courts to substitute their unfamiliarity for the expertness of those skilled and qualified to act within their specific field.

■■ The presumption is rebuttable, but the cases are uniform in holding that he who challenges the validity of a patent must carry a heavy burden of proof to overcome the presumption. Preceding an unbroken line of cases to the same effect is Mumm v. Jacob E. Decker & Sons, supra, 301 U.S. at 171, 57 S.Ct. at 676, wherein it is stated:

> "The issue of the patent is enough to show, until the contrary appears, that all the conditions under which a discovery is patentable in accordance with the statutes have been met. Hence, the burden of proving want of novelty is upon him who avers it. Walker on Patents, § 116. Not only is the burden to make good this defense upon the party setting it up, but his burden is a heavy one, as it has been held that 'every reasonable doubt should be resolved against him.' Id., Cantrell v. Wal-

lick, supra [117 U.S. 689, 6 S.Ct. 970, 29 L.Ed. 1017]; Coffin v. Ogden, 18 Wall. 120, 124 [21 L.Ed. 821]; Barbed Wire Patent, 143 U.S. 275, 284, 285 [12 S.Ct. 443, 36 L.Ed. 154]; Adamson v. Gilliland, 242 U.S. 350, 353 [37 S.Ct. 169, 61 L.Ed. 356]."

This presumption is further reinforced where, as here, the patent was granted after a thorough consideration by the Patent Office and then only after a review by the Board of Appeals.

Apropos this rule, Judge Rives, in Southern States Equip. Corp. v. USCO Power Equip. Corp., 5 Cir., 1953, 209 F. 2d 111, 118, stated:

> "This view as to their validity, reached independently of a similar finding by the trial court, is further reinforced by the usual presumption of validity attending the issuance of the patents by the Patent Office, here strengthened by its repeated consideration and distinguishing of the same prior patents cited before issuing the patents in suit. See Hunt v. Armour & Co., 7 Cir., 185 F.2d 722, 726; Lewyt Corp. v. Health-Mor, Inc., 7 Cir., 181 F.2d 855, 857; cf. Jacuzzi Bros. v. Berkeley Pump Co., 9 Cir., 191 F.2d 632, 634."

To like effect is Universal Incorporated v. Kay Mfg. Corp., 195 F.Supp. 241, 246, where the Court, after citing Mumm v. Jacob E. Decker & Sons, supra, on the burden of proof, said:

> "And the presumption of validity is strengthened where the patent was granted only after considerable controversy in the Patent Office, and after review by the Board of Appeals. Baker-Cammack Hosiery Mills v. Davis Co., 4 Cir., 1950, 181 F.2d 550, certiorari denied 340 U.S. 824, 71 S.Ct. 58, 95 L.Ed. 605."

■ The defendant asserts that the presumption of validity does not apply or is greatly weakened since the patents on which it relies as showing anticipation were not listed in the file wrapper

of the patent in suit.[3] However, even if the patents relied on by the defendant for anticipation were not cited by the Patent Office as part of the prior art, this Court cannot assume that the Patent Office has not considered them. See Anderson Co. v. Sears, Roebuck & Co., 7 Cir., 265 F.2d 755, and Davis v. Buck-Jackson Corp., D.C., 138 F.Supp. 908.

The opinion in Artmoore Co. v. Dayless Mfg. Co., 7 Cir., 208 F.2d 1, is noted as follows:

"Defendants' argument based on these prior art patents, not cited in the patent office, is not convincing. It has been held, and we think with logic, that it is as reasonable to conclude that a prior art patent not cited was considered and cast aside because not pertinent, as to conclude that it was inadvertently overlooked. Adler Sign Letter Co. v. Wagner Sign Service, 7 Cir., 112 F.2d 264, 267; Charles Peckat Mfg. Co. v. Jacobs, 7 Cir., 178 F.2d 794, 802."

Of the patents relied on by the defendant, the uncontroverted evidence shows that the Keech patent was considered by the Examiner who handled applicant's abandoned application, serial No. 649,746, and that the Alexander patent, serial No. 566,470, was called to the attention of the Examiner by the applicants themselves.

In Otto v. Koppers Co., 4 Cir., 246 F.2d 789, 801, a similar situation as that with regard to Keech existed, and the Court, after stating the presumption of validity and the fact it was strengthened by extensive administrative proceedings, said:

"The presumption is attacked first on the ground that relevant prior art was not cited by the Examiner in the Patent Office, particularly Tiddy, Patent No. 1,997,757. The patent in suit, however, was issued upon an application which was a continuation in part and consolida-

tion of several prior copending applications, in one of which the Tiddy patent was cited. In the proceedings on the superseding application the Examiner (the same individual who had handled the earlier applications) was relying only upon Jeremiassen as being anticipatory, but reference was made to the earlier applications and the claim that the Tiddy patent was not cited or considered as a relevant reference in the Patent Office cannot be sustained. 35 U.S.C.A. § 120. See the opinion of Judge Soper in Gibbs v. Montgomery Ward & Co., D.C.Md., 19 F.2d 613, 616, affirmed 4 Cir., 27 F.2d 466."

See also, Glatt v. G. C. Murphy Co., D.C., 168 F.Supp. 50, and Footnote 11 of the Court's opinion by Judge Rives in Georgia Kaolin Co. v. Thiele Kaolin Co., 5 Cir., 228 F.2d 267, 271. Therefore, since mere omission of patents from the file wrapper is not conclusive to warrant a holding that they were not considered by the Patent Office, the Court, based on the uncontradicted evidence, has held that they are "of record" in the file of the application of the patent in suit and entitled to the presumption of the validity accorded patents listed in the file wrapper.

The burden of proof necessary to rebut the presumption of validity with respect to the Keech and Alexander patents has not been sustained for the reasons set out in the findings above. On the contrary, for the same reasons the Court does not consider that they disclose any element in the defense of anticipation more pertinent than was considered by the Patent Office hereinafter discussed.

■ The plaintiff admits that the remaining patents, British patent No. 581,962, French patent No. 631,120 and Italian patent No. 514,072, cited as anticipation, were not considered by the Patent

---

3. Murray Company of Texas, Inc. v. Continental Gin Co., 5 Cir., 264 F.2d 65, 69:
"But where, as here, the Patent Office has failed to consider pertinent art, the statutory presumption of validity is greatly weakened."

154

Office. However, in order to weaken the presumption of validity they must involve some substantial elements in the defense of anticipation which were not considered by the Patent Office. This principle is clearly set out in Otto v. Koppers Co., supra, wherein it is said:

"Astute and enterprising attorneys can always find references not of record in the Patent Office, but if they do not involve some substantial element in the defense of anticipation which was not considered by the Patent Office, the failure to make them record references cannot weaken the statutory presumption."

The essence of the invention of the patent in suit is a pipe joint embodying an outer holding means in the bell of the pipe for a gasket of either monolithic or dual hardness, to prevent axial displacement of the gasket upon the insertion of a spigot within a given range of tolerances and within a given degree of deflection, thus permitting a seal under radial compressive force to be effected upon insertion of the spigot in the bell. More succinctly stated, the prime factors in this invention are (1) position of the gasket which enables the insertion of a spigot within a given range of tolerances at a given degree of deflection to effect (2) a seal under radial compressive force.

The general test for determining whether prior art constitutes anticipation is set out in Walker on Patents, Deller's Edition, at page 255, § 47, as follows:

"Therefore in order to negative novelty or, as it is usually expressed, to 'anticipate' an invention, it is necessary that all of the elements of the invention or their equivalents be found in one single description or structure where they do substantially the same work in substantially the same way. [Imhaeuser v. Buerk, 101 U.S. 647, 660, 25 L.Ed. 945 (1879); Bates v. Coe, 98 U.S. 31, 25 L.Ed. 68 (1878); Ottumwa Box Car Loader Co. v. Christy Box Car Loader Co., 215

Fed. 362, C.C.A.8; Ventilated Cushion & Spring Co. v. D'Arcy, 232 Fed. 468, C.C.A.6 (1916); Dow Chem. Co. v. Williams Bros. Well Treating Co. [Corp.], 81 F.(2d) 495, 501, C.C.A.10 (1936); Universal Oil Products Co. v. Winkler-Kock E. Co., 6 F.Supp. 763, 770, D.C.D. Del. (1934), aff'd 7 [78] F.(2d) 991, C.C.A.3 (1935).]

The Fifth Circuit Court of Appeals, in Fairchild v. Poe, 259 F.2d 329, allowed all the different prior art patents to be considered together as a part of the test. However, the result is the same with respect to the patents cited herein as anticipatory.

Taking the above-listed patents either singularly or in combination, they do not disclose an outer holding means for a gasket which effects a seal under radial compressive force upon insertion of a spigot at a given degree of deflection and within a given range of tolerances. The Court, therefore, concludes that there are no essential elements in the defense of anticipation presented by these patents which were not considered by the Patent Office, and the presumption of validity remains unaffected. Since the presumption of validity has neither been weakened nor rebutted, the Court is led to the conclusion that the patent in suit was not anticipated.

The next issue to be considered is whether plaintiff's invention was "obvious" at the time it was made within the meaning of Section 103 of Title 35 U.S.C.A.;

"A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the

manner in which the invention was made."

A device to be patentable must disclose that degree of ingenuity and skill defined by patent law as "invention." The key to patentability of a mechanical device employing a combination of old elements is the presence or lack of invention. The test of invention on a device having a combination of elements is set out in Little Mule Corp. v. The Lug All Co., 5 Cir., 254 F.2d 268, 274:

"It is well established that:

"'A combination of old elements which accomplishes a new and beneficial result, or attains an old result in a more facile, economical, or efficient way, may be protected by a patent as securely as a new machine or composition of matter. [Seymour v. Osborne, 11 Wall. (516), 78 U.S. 516, 542, 548, 20 L. Ed. 33; Gould v. Rees, 15 Wall. (187), 82 U.S. 187, 189, 21 L.Ed. 39; Thomson v. Citizens' National Bank, 8 Cir., 1892, 53 F. 250, 253] * * *.' 3 Deller's Walker on Patent, § 482, p. 1728. See also Loom Co. v. Higgins, 1881, 105 U.S. 580, 591, 26 L.Ed. 1177. This court adheres to that rule. Jeoffroy Mfg., Inc. v. Graham, 5 Cir., 1955, 219 F. 2d 511, 519."

However, if the combination of elements as a whole would have been obvious in view of the prior art to a person having ordinary skill in the art, Section 103 of Title 35 U.S.C.A., applies, and the device embodying the combination will not be entitled to a patent.

The substance and the function of the patent in suit has been set out above in the consideration of the issue of anticipation. There can be no valid contention that it does not meet the test of invention, i. e., accomplishes a new and beneficial result or attains an old result in a more facile, economical and efficient way. The issue as drawn is whether or not the combination accomplishing the results disclosed by the patent in suit would have been "obvious" within the meaning of Section 103.

In addition to the patents cited as constituting anticipation, the defendant has further cited 21 patents and one publication in an effort to show that the patent in suit discloses a device that was "obvious" to a person having ordinary skill in the art. When Judge Parker, speaking for the Court, in Reynolds v. Whitin Mach. Works, 4 Cir., 167 F.2d 78, 83, had occasion to consider a like contention, he made the following pronouncement:

"Defendant has cited 21 patents as basis for its contention that complainants' invention is lacking in novelty; and this in itself is evidence of the weakness of the contention. Such a citation of so many prior patents almost always means either that none of them is in point and that the patentee has brought together for the purpose of his invention devices to be found in prior patents of different character, or that there have been prior attempts to solve the problem with which he was confronted which have not met with success. Hoeltke v. C. M. Kemp Mfg. Co., supra [4 Cir., 80 F.2d 912]; Scott v. Fisher Knitting Mach. Co., 2 Cir., 145 F. 915, 916; Mahony v. Malcom, 7 Cir., 143 F. 124, 125; Forsyth v. Garlock, 1 Cir., 142 F. 461, 463; Mallinckrodt Chemical Works v. E. R. Squibb & Sons, D.C.Mo., 6 F.Supp. 173, 175; York Ice Machinery Corporation v. L. & K. Ice Corporation, D.C.N.Y., 6 F.Supp. 544, 546; Handy v. American Flyer Mfg. Co., D.C.N.Y., 44 F.2d 633, 635; Gillette Safety Razor Co. v. Clark Blade & R. Co., C.C.N.J., 187 F. 149, 152. Patents for useful inventions ought not to be invalidated and held for naught because of such excursions into the boneyard of failures and abandoned experiments."

Of these additional patents cited, those to Bille, Marx, Nathan (2 patents), Mc-Wane No. 2,245,154, and Moore were

considered by the Patent Examiner handling the application of the patent in suit, and the Court has held that none of the remaining patents cited are as pertinent to the prior art as those considered.

The same presumption of validity set out above with respect to anticipation, including the authorities there cited, applies in determining "obviousness," and since defendant has cited no prior art more pertinent than that considered by the Patent Office, the presumption remains unimpaired. In determining "obviousness," Judge Hand, in the very recent case of Reiner et al. v. I. Leon Co., supra, stated:

"The test laid down is indeed misty enough. It directs us to surmise what was the range of ingenuity of a person 'having ordinary skill' in an 'art' with which we are totally unfamiliar; and we do not see how such a standard can be applied at all except by recourse to the earlier work in the art, and to the general history of the means available at the time. To judge on our own that this or that new assemblage of old factors was, or was not, 'obvious' is to substitute our ignorance for the acquaintance with the subject of those who were familiar with it. There are indeed some sign posts: e. g., how long did the need exist; how many tried to find the way; how long did the surrounding and accessory arts disclose the means; how immediately was the invention recognized as an answer by those who used the new variant? In the case at bar the answers to these questions all favor the conclusion that it demanded more intuition

than was possessed by the 'ordinary' workers in the field. The needs were known, but the purpose to fulfil them with that minimum of material and labor disclosed in the patent had not appeared; and economy of production is as valid a basis for invention as foresight in the disclosure of new means. In the case at bar the saving of material as compared to anything that had preceded, was very great indeed; the existing devices at once yielded to Reiner's disclosure; his was an answer to the 'long-felt want.' "

These "sign posts" adverted to, when applied to the instant case, dispel any contention that the device disclosed by the patent in suit was obvious.

The evidence in this case revealed that the pipe industry was conscious of the deficiencies which plaintiff's pipe joint eliminated and that they had been seeking to remedy these deficiencies for many years. Plaintiff's assignors, Haugen and Henrikson, experimented for four years before they were able to perfect the joint. In addition to the general desire of the industry to perfect a better joint the need was further accentuated in the cast iron pressure pipe industry by competition from the cement-asbestos industry which adversely affected the sale of cast iron pressure pipe, and this competition served to further magnify the need for the pipe joint which plaintiff was able to provide.[4] The pertinent prior art cited has existed for many years and the invention was immediately recognized and met with overwhelming success as demonstrated in the Court's findings of fact.[5]

4. In Edward Valves, Inc. v. Cameron Iron Works, Inc., supra, it was said that:
"An unfavorable economic situation existing at the time of invention in no way disproves the novel concept of a patent."

5. Further illustrative of the commercial success is the number of licenses which have been taken on plaintiff's patent herein. See Switzer et al. v. Marzall, D.C. Dist. of Col., 94 F.Supp. 52 (quoting in part from the opinion in Jungersen v.

Ostby & Barton Co., 335 U.S. 560, 69 S.Ct. 269, 93 L.Ed. 235), where it was said:
"While the commercial success of a new development does not render a patent valid, the Supreme Court has stated that 'in cases where the question of patentable invention is a close one, such a success has weight in tipping the scales of judgment toward patentability.' In the instant case I find the widespread recog-

In Diamond Rubber Co. of New York v. Consolidated Tire Co., 220 U.S. 428, 435, 31 S.Ct. 444, 55 L.Ed. 527, the Court stated in a frequently quoted opinion that:

"Knowledge after the event is always easy, and problems once solved present no difficulties, indeed, may be represented as never having had any, and expert witnesses may be brought forward to show that the new thing which seemed to have eluded the search of the world was always ready at hand and easy to be seen by a merely skillful attention. But the law has other tests of the invention than subtle conjectures of what might have been seen and yet was not. It regards a change as evidence of novelty, the acceptance and utility of change as a further evidence, even as demonstration."

The presumption of validity in this case has been strengthened as stated above by this invention filling a longfelt need in the industry and its immediate commercial use and success when it was placed on the market by plaintiff. In addition to these factors, the fact that the defendant imitated plaintiff's patent is entitled to great weight in determining whether the device disclosed was "obvious." In this case, the defendant not only imitated plaintiff's patent but obtained a patent on the imitation, taking the position before the Patent Office with regard to "obviousness" which it now seeks to have this Court reject. A similar situation is disclosed in Sel-O-Rak Corp. v. Henry Hanger & Display Fixture Corp. of America, 5 Cir., 232 F.2d 176, as to which the Court made the following observations:

"As was said by the Court of Appeals for the Second Circuit in Kurtz v. Belle Hat Lining Co. (280 F. 277, 281) and quoted approvingly in two decisions of the Fourth Circuit (Ackermans v. General Motors Corp., 202 F.2d 642, and Black & Decker Mfg. Co. v. Baltimore Truck Tire Service Corp., 4 Cir., 40 F.2d 910):

" 'The imitation of a thing patented by a defendant, who denies invention, has often been regarded, perhaps especially in this circuit, as conclusive evidence of what the defendant thinks of the patent, and persuasive of what the rest of the world ought to think.'

"There is expression of a similar thought in Schenck v. Diamond Match Co. (3 Cir., 77 F. 208, 209) where the court says:

" 'The defendants may well be regarded as experts in the art, and their conduct was an unbiased and emphatic expression of judgment in favor of the patent; their present expression and that of their experts are probably entitled to less weight.'

"Moreover, on the issue of invention the failure of appellees to arrive at this design through the many years in which they were making trouser racks for the trade is highly significant."

The defendant also introduced a drawing by William Bevington, which was stipulated to read on plaintiff's claim 2 of the joint in suit. The Court, after weighing Bevington's testimony and observing his demeanor, has concluded that he is a person having more than ordinary skill in the art within the context of the statute. Further, his drawing was never tested or used thereafter. Therefore, anything done by Bevington would not fall within Section 103 and would have no bearing on the determination of "obviousness".

Since no prior art was cited which was more pertinent than that considered by the Patent Office and the presumption

nition by industry, government, and the public of the utility of materials treated by plaintiff's process, and the fact that established firms have become licensees of plaintiff prior to his obtaining of a patent,

sufficient to tip the scales in favor of patentability, if it be conceded that the question is a close one."

See also, Coltman v. Colgate-Palmolive Peet Co., 7 Cir., 1939, 104 F.2d 508.

of validity remains applicable, strengthened by the objective facts mentioned above, it is abundantly clear that defendant has failed to rebut this presumption and the device disclosed by plaintiff's patent was not "obvious" within the meaning of Section 103.

The remaining issue for disposition arises from defendant's contention that plaintiff procured the patent in suit by fraud.

During the pendency of the application in the Patent Office, the application as to claim 35 (claim 5 herein) was placed in interference with an application filed by Yves Mathieu which relied on two earlier Brazilian filing dates. The interference proceeding was terminated by settlement pursuant to which a disclaimer of the count of the interference was filed by Mathieu. Plaintiff's patent subsequently issued. Defendant contends that Mathieu's application disclosed that he was the first inventor, and since a patent can only issue to the "first inventor" it was fraud as a matter of law for Haugen and Henrikson to procure the disclaimer and obtain the patent in suit.

The evidence is uncontroverted that plaintiff's counsel examined Mathieu's Brazilian applications on which Mathieu would have to rely in order to prevail in the interference proceedings, and counsel determined that these applications would not support the count of the interference, and that Mathieu could only rely on his United States filing date, which was subsequent to the date of plaintiff's invention and reduction to practice. The evidence does not disclose that this was not a bona fide determination by counsel, and since fraud is never presumed, the Court concludes that the determination was made in good faith.

In a situation similar to that here presented, fraud was charged with respect to a disclaimer in Sales Affiliates, Inc. v. Hutzler Bros. Co., D.C.Md., 71 F.Supp. 287, 296. The facts are disclosed in the following extract from the trial court's decision:

"The application for the present patent was filed June 20, 1938, although, as stated in the patent, this application was a continuation, in part, of patentees' application, serial No. 167934, which had been filed October 8, 1937, but thereafter abandoned. The progress of the later application through the Patent Office was slow and protracted due, to some extent, to the fact that it was placed in interference with an application by one Karel Bohemen, a Dutch subject, which had been filed on July 24, 1937, and which corresponded to a French patent, No. 824,-804, issued to one William Fletcher. *This proceeding, however, was terminated by settlement between the parties, Bohemen withdrawing in favor of Evans & McDonough in consideration of his getting a license under their patent from the present plaintiff.*" (Emphasis supplied.)

This decision was appealed, Hutzler Bros. Co. v. Sales Affiliates, Inc., 4 Cir., 164 F.2d 260, 267, and the contention as to fraud was disapproved in the following language:

"We cannot attach, as defendants seem to suggest, any ulterior motives, or any improper conduct, to plaintiffs in connection with the agreed settlement with Bohemen in the interference proceedings. Had the interference proceedings been prosecuted to final judgment, this would have unquestionably delayed the granting of the patent in suit. There were ample business reasons for a friendly settlement. And there was evidence to show that this settlement was recommended by Bohemen's attorney after a review of the proofs of the priority of Evans and McDonough."

The issue of fraud in the procurement of a patent was considered by the Fifth Circuit in the recent case of Edward Valves, Inc. v. Cameron Iron Works, supra, wherein it was stated:

"The appellants have a heavy burden in alleging fraud. See Metal

Extrusions, Inc., D.C.Fla., 1956, 145 F.Supp. 51, affirmed Porterfield v. Gerstel, 5 Cir., 1957, 249 F.2d 634; Becton Dickinson & Co. v. R. P. Scherer Corp., 6 Cir., 1954, 211 F.2d 835. Fraud is a question of fact."

 From the facts disclosed by this record, fraud is not established as a matter of law as the defendant contends. Fraud, as noted from Edward Valves, Inc., is a question of fact. The facts do not disclose any conduct on the part of plaintiff sufficient to sustain the heavy burden of the charge of fraud leveled at the plaintiff.

Defendant does not and cannot rely on Mathieu's application as anticipating the invention in suit, and since defendant's resort to fraud as the inducement to the disclaimer and subsequent abandonment of his application is already decided adversely to it, it takes nothing by the fact of the abandonment of the application, since an abandoned application is without effect on prior inventorship. Joseph Bancroft & Sons Co. v. Brewster Finishing Co., Inc., D.C., 113 F.Supp. 714, and cases cited at page 716 thereof; 35 U.S.C.A. § 102(g).

Pursuant to the foregoing, the Court concludes that:

A. The Court has jurisdiction of the parties and of the subject matter of the issues framed by all of the pleadings herein.

B. The plaintiff has maintained its burden of proof of the essential facts of its complaint. The defendant has not maintained the burden of the essential facts of any of its defenses or affirmative defenses. The law is with the plaintiff and against the defendant on each of the issues framed by the pleadings.

C. United States Letters Patent 2,953,398, entitled "PIPE JOINT" as to claims 1, 2, 4, 5, 7 and 8 here in suit, is in all respects valid.

D. Defendant has infringed the aforesaid claims of the patent in suit by making and selling pipe joints embodying the claimed features thereof, by in-

ducing others to infringe the same, and also is in violation of the aforesaid claims of said patent as a contributory infringer.

E. Plaintiff is entitled to:

(1) An injunction against the defendant enjoining further infringement, direct or contributory, of each of the aforesaid claims 1, 2, 4, 5, 7 and 8 of the patent in suit; and,

(2) An accounting, pending which, and under the authority of E-I-M Co. v. Philadelphia Gear Works, 5 Cir., 223 F.2d 36, the Court withholds a determination as to whether the infringement has been willful and deliberate and whether a punitive award is justified under Title 35 U.S.C.A. § 284. The Court also withholds a determination of the allowance of a reasonable attorney's fee under Section 285. Jurisdiction as to both matters is specifically reserved.

Counsel for plaintiff will submit an appropriate form of judgment for the Court's consideration.